WHITFIELD, et al., Appellants,

v.

CITY OF DAYTON, et al., Appellees.

[Cite as *Whitfield v. Dayton*, 167 Ohio App.3d 172, 2006-Ohio-2917.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 21072.

Decided June 9, 2006.

174

Kelvin I. Boddie and Richard W. Schulte, for appellant Renita Whitfield.

Richard W. Thiry, for appellant Shawntell Bernard.

Neil F. Freund, for appellees.

Steven Dean and Jonathan Beck, for appellee State Farm Mutual Automobile Insurance Company.

Per Curiam.

{¶ 1} This case arises from a police pursuit that took place on August 16, 2002, at around 7:00 p.m., in the city of Dayton. At that time, the city had a policy prohibiting officers from becoming engaged in vehicular pursuits except in situations involving felonies, provided that "the felony for which the arrest is sought involved an actual or threatened attack against another person which the officer has reasonable cause to believe could result in death or serious bodily harm."

{¶ 2} The pursuit policy was contained in Executive Order No. 5–2002, which was issued on January 18, 2002. The executive order changed the former pursuit policy, effective immediately, "due to concerns for the safety of officers and citizens in the community." Many police officers did not like the restrictions in the new policy. However, the police chief at the time, William McManus, testified that he had amended the policy in order to bring Dayton in line with the best police practices across the country. According to McManus, police departments were revising policies to be much more restrictive and to give officers less discretion because of the danger involved in police pursuits and the risk to officers, persons being pursued, and the public. Dayton's assistant chief, Julian Davis, who is now Chief of Police, also stressed that the new policy was intended to curb police pursuits in urban areas because pursuits are inherently dangerous.

{¶ 3} On August 16, 2002, Sergeant Steven Abney was working as a patrol officer in the city's Third District. Shortly before 7:00 p.m., Abney was out of his district, sitting at the end of an exit ramp leading from Interstate 75 to North Main Street. Abney was typing a message and was preparing to go get a cup of coffee in the Fifth District, when he saw a 1989 Delta 88 Oldsmobile ("Delta 88") traveling by him at an excessive rate of speed. The Delta 88 almost struck

Abney's cruiser. When the driver stopped at the red light at the end of the exit ramp, he waved at Abney as if to apologize for the mistake. At first, Abney decided to let the driver go because he thought the driver had simply made an honest mistake. However, another citizen pulled up next to Abney, pointed at the Delta 88, and told Abney that the driver previously had been up on the highway, had been driving erratically, and should be stopped.

{¶ 4} Based on these facts, Abney turned left onto North Main Street and followed the Delta 88 for a short distance. After the two cars had cleared a few intersections, Abney decided to make a traffic stop. Abney then turned on his overhead lights, and the Delta 88 pulled over into the parking lot of a restaurant called Chicken Louie's. Abney intended to pull the driver over for a traffic offense and had already given the dispatcher the license number of the Delta 88. He did not get any information from the dispatcher that indicated the car had been stolen.

{¶ 5} Abney got out of his cruiser and walked toward the Delta 88. However, when he reached the back bumper, the driver took off. Abney went back to his cruiser, notified the dispatcher of the direction in which the car had fled, and drove in that direction. Abney claimed that he was not pursuing at that point, but was instead simply following the vehicle for a short distance to get a direction. However, both the police chief and assistant police chief testified that none of the conditions required for a pursuit were present and that Abney should never have followed the car. Under the policy, if a traffic stop occurs and the violator pulls away, the officer is to report the fact to the dispatcher and is not to follow.

{¶ 6} The driver of the Delta 88 was Jerrold Bailey. Bailey's brother, Greg Hobson, was a passenger in the car. Bailey claimed that he left the traffic stop because Abney had drawn his gun when approaching the car. Allegedly, Bailey was afraid of the police because they had killed his uncle. However, Bailey had been drinking and using drugs earlier that day.

{¶ 7} As we mentioned, Abney turned on his overhead lights when he originally made the traffic stop. Abney left the lights on while "following" Bailey, who sped off at around 7:03 p.m. About 47 seconds later, Abney radioed dispatch that he was trying to "catch Bailey." Abney testified that he decided he was justified in starting pursuit 36 seconds after this dispatch, because Bailey had committed a felony crime against persons by driving on the wrong side of the road, as if intentionally trying to force an accident. This rationale was viewed with skepticism by Abney's supervisors. Specifically, Chief Davis testified that he would not interpret Bailey's action in speeding and driving left of center as a felony against unknown citizens. Instead, it would have been an attempt to get away from the

police. Chief McManus also agreed that pursuing Bailey under this circumstance was a policy violation.

{¶ 8} After deciding to pursue, Abney chased Bailey for another five minutes with lights and sirens on, through several miles of urban and residential streets. At around 7:05, a cruiser driven by Officer Smith arrived and took over as lead cruiser in the chase. At the time, Smith was working for Abney in the Third District. Smith said that he heard Abney's dispatch about Bailey while sitting on a back street about a block from Interstate 75, monitoring traffic coming into downtown Dayton from Third Street. Smith then decided to go over and assist Abney.

{¶ 9} Smith claimed that in a minute or less, he was able to travel from his location on Third Street, to the interstate, up the interstate to the next exit, down the exit ramp, and up North Main Street, without using his siren and lights, and by observing speed limits and stop lights. This explanation was also the subject of skepticism on the part of Lt. Sherrer, who was the commanding officer for the entire city that day. Sherrer indicated that the pursuit occurred a long distance outside the Third District and was not just on the border. Therefore, Smith's account of how he arrived did not make sense.

{¶ 10} In any event, by about two minutes after Bailey fled the traffic stop, Smith was the lead car in the pursuit. Smith reported to dispatch at 7:05 and 17 seconds (or a little more than two minutes after Bailey fled) that he had seen someone throw a shotgun out the window of the Delta 88. Again, both McManus and Davis testified that this would not have justified pursuit.

{¶ 11} After the gun was thrown out, the Delta 88 traveled westbound on Vincent Avenue, where Bailey slowed to about five miles per hour and checked at the stop sign to see whether traffic were clear. Bailey then turned southbound on Main Street, and traveled about 45 miles per hour, with the two cruisers behind him. During the trip down Main, Bailey changed lanes once and went into the lane for oncoming traffic at one intersection, to avoid a collision with a van. Smith stated that at that point, he did not see that Bailey was trying to use his vehicle as a weapon. Instead, Bailey was trying to get away from the police. Eventually, Bailey turned onto Riverview Drive, and accelerated to about 50 miles per hour.

{¶ 12} Both Abney and Smith were several miles outside their district when the pursuit occurred. They traveled at speeds as fast as 55 miles per hour, in residential neighborhoods with which Smith, at least, was unfamiliar. It was early evening on a summer night, and there were parks, playgrounds, and a swimming pool in the area, as well as residences and apartment buildings. Although Abney and Smith claimed they drove slowly at times, kept a substantial distance between themselves and Bailey, and proceeded with care though inter-

sections, a witness who observed the pursuit on West Riverview Drive testified that the Delta 88 drove by her at a high rate of speed, between 55 and 60 or even higher, with three police cars traveling right behind at the same rate of speed. The witness also said that the police were immediately behind the Delta 88, only one car length away. According to the dispatch times and the witness's testimony, the location where this occurred was slightly less than two minutes before the collision.

{¶ 13} After passing the car occupied by the witness, Bailey continued down West Riverview and then turned onto Catalpa Drive, going northbound. Bailey was driving about 55 miles per hour and ran three stop signs on Catalpa before running the last stop sign at Catalpa and Oxford. At that point, Bailey collided with a car being driven westbound on Oxford. The driver of that vehicle, Steven Whitfield, was killed as a result of the accident, and Whitfield's passenger, Shawntell Bernard, was injured.

{¶ 14} Officer Smith testified that he was aware that Bailey was driving 55 miles per hour and was running stop signs in a residential neighborhood where the speed limit was 25 miles per hour. In addition, the road in that area went up a rather steep hill. As we noted earlier, Smith was unfamiliar with the neighborhood, as it was out of his district.

{¶ 15} Lt. Sherrer arrived on the scene shortly after the accident occurred. Sherrer heard about the pursuit almost five minutes before the crash. For a short time, he was unable to communicate because the battery on his portable radio was not working. However, for almost four minutes of the pursuit, Sherrer was in his car, which did have an operable radio that would have allowed him to communicate with Abney and Smith. During that time, Sherrer made no attempt to communicate with these individuals, nor did he ask for any information about the reason for the pursuit. Although Sherrer claimed he was not the person with ultimate authority to call off the pursuit, both McManus and Davis indicated that as watch commander, Sherrer would have had authority either to let the pursuit continue or to call it off.

{¶ 16} Following the accident, Whitfield's estate and Bernard both filed suit against the city of Dayton, the police officers who were associated with the pursuit, the driver, Bailey, and Cletus and Gwen Albers, who owned the Delta 88. State Farm Insurance Company insured Bailey and intervened in order to resolve coverage issues. After consolidating the cases, the trial court granted summary judgment to State Farm and to all defendants except Bailey and indicated that under Civ. R. 54(B), there was no just cause for delay. The plaintiffs appealed, and now raise the following assignments of error:

{¶ 17} "I. The trial court erred in applying the *Lewis v. Bland* standard of review with respect to a police pursuit where the statutory immunity had been removed.

{¶ 18} "II. The trial court erred in determining as a matter of law that the proximate cause issue in a police chase case was not a jury question.

{¶ 19} "III. The trial court erred in finding that the Oldsmobile Alero was in the shop at the time of the August 16, 2002 accident.

{¶ 20} "IV. The trial court erred in granting summary judgment to State Farm on the basis that four months was an unreasonable delay in giving notice of the accident and on the basis that State Farm was prejudiced as a result."

## I.

{¶ 21} Because the first two assignments of error involve the same general issue, they will be considered together. In these assignments of error, plaintiffs contend that the trial court improperly added a layer of immunity by requiring, as a condition of establishing proximate cause, that the conduct of the police officers be extreme or outrageous.

{¶ 22} After construing the facts in plaintiffs' favor, the trial court found that Officers Smith and Abney were responding to an emergency call and that genuine issues of material fact existed with regard to whether their conduct was reckless. Despite this finding on recklessness, the court granted summary judgment in favor of the city and the police officers. The decision was based on *Lewis v. Bland* (1991), 75 Ohio App.3d 453, 599 N.E.2d 814, which held that when police officers pursue a fleeing violator who injures a third party, the officers' pursuit is not the proximate cause of the injuries unless their conduct was outrageous or extreme. Plaintiffs claim in their first assignment of error that the trial court erred in relying on *Lewis* because the proximate-cause standard improperly supplants Ohio's governmental immunity statutes and the legislative intent behind those statutes. In the second assignment of error, plaintiffs contend that, beyond policy arguments, proximate cause is a matter that should be reserved for the jury.

{¶ 23} R.C. 2744.02(A)(1) grants political subdivisions immunity from liability for injuries caused by acts or omissions of the subdivision or its employees in connection with governmental or proprietary actions. However, R.C. 2744.02(B) provides exceptions to immunity. The exception relevant to this case is R.C. 2744.02(B)(1), which allows subdivisions to be held liable for "injury, death, or loss to person or property caused by the negligent operation of any motor vehicle by their employees when the employees are engaged within the scope of their

employment and authority." The negligent-operation exception, in turn, is subject to a full defense to liability where:

{¶ 24} "A member of a municipal corporation police department or any other police agency was operating a motor vehicle while responding to an emergency call and the operation of the vehicle did not constitute willful or wanton misconduct." R.C. 2744.02(B)(1)(a).

{¶ 25} In *Colbert v. Cleveland*, 99 Ohio St.3d 215, 2003-Ohio-3319, 790 N.E.2d 781, the Ohio Supreme Court held that an "emergency call" under R.C. 2744.02(B)(1)(a) is not limited to calls to duty that concern inherently dangerous situations. The court instead adopted a broader interpretation that includes situations "to which a response by a peace officer is required by the officer's professional obligation." Id. at ¶ 15. In *Colbert*, the "professional obligation" was that officers had witnessed a suspected drug deal and had proceeded in their patrol car to intercept the suspects, who were on foot. Id. at ¶ 16.

{¶ 26} After *Colbert*, officers are clearly on "emergency calls" for purposes of R.C. 2744.02(B)(1)(a) if they witness illegal activity and are pursuing an alleged wrongdoer. As a result, we are compelled to agree with the trial court that Smith and Abney were on an emergency call. Ironically, both Chief Davis and Chief McManus stated that Abney was not on an emergency call when he decided to pursue Bailey. In fact, Davis commented that Abney initiated the pursuit and "turned it into an emergency situation." One might question whether an officer's disregard of departmental policies is something required by his "professional obligation," but that does not appear to be relevant under *Colbert*.

{¶ 27} The second requirement for attachment of the defense under R.C. 2744.02(B)(1)(a) is that the operation of the vehicle must not be wanton or willful misconduct. In this context, the trial court found that genuine issues of material fact existed regarding whether the officers acted recklessly. In reaching this conclusion, the trial court refused to consider the violations of the pursuit policy, finding those matters irrelevant. Furthermore, while the court found issues existed as to recklessness, it concluded that the officers did not act willfully or wantonly.

{¶ 28} As a preliminary matter, we note that the trial court appears to have been confused about the meaning of wanton, willful, and reckless misconduct. In *Brockman v. Bell* (1992), 78 Ohio App.3d 508, 605 N.E.2d 445, the First District Court of Appeals discussed the meaning of these terms in the context of a governmental-immunity case. The First District observed that the terms are "best be defined at points on a continuum between negligence, which conveys the idea of inadvertence, and intentional misconduct." Id. at 515, 605 N.E.2d 445.

According to the First District, "wanton misconduct" has been defined as "the failure to exercise any care toward one to whom a duty of care is owed when the failure occurs under circumstances for which the probability of harm is great and when the probability of harm is known to the tortfeasor." Id.

{¶ 29} In contrast, "willful misconduct" involves a more positive mental state prompting the injurious act than wanton misconduct, but the intention relates to the misconduct, not the result. Id. Consequently, "willful misconduct" is defined as follows:

{¶ 30} " '[A]n intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposely doing some wrongful acts with knowledge or appreciation of the likelihood of resulting injury.' " Id., quoting *Tighe v. Diamond* (1948), 149 Ohio St. 520, 527, 37 O.O. 243, 80 N.E.2d 122.

{¶ 31} In analyzing the place of "reckless misconduct" on the continuum, the First District initially considered the criminal-code definition of recklessness and concluded that this definition would place reckless misconduct between willful misconduct and intentional wrongdoing. Id. In other words, reckless misconduct would be more severe than willful misconduct. However, the First District also noted that the Ohio Supreme Court had adopted the definition of reckless misconduct set forth in 2 Restatement of the Law 2d, Torts (1965) 587, Section 500, which states that an actor's conduct is the following:

{¶ 32} " '[R]eckless disregard of the safety of others if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.' " Id. at 516, 605 N.E.2d 445.

{¶ 33} The First District observed that comment f to Section 500 of the Restatement compares recklessness with intentional misconduct by providing that while an actor must intend a reckless act, he need not intend the harm that results. Accordingly, the First District concluded that "reckless misconduct" as defined by Section 500 of the Restatement can be used interchangeably with "willful misconduct." Id. In view of this fact, the First District further found:

{¶ 34} "[F]or purposes of the immunity afforded under R.C. Chapter 2744, 'wanton or reckless misconduct' under R.C. 2744.03(A)(6) may be viewed as the functional equivalent of 'willful or wanton misconduct' under R.C. 2744.02(B)(1)(b)." Id.

{¶ 35} Because the terms "willful" and "reckless" misconduct are used interchangeably, the trial court's finding that factual issues existed as to recklessness requires a like finding on the issue of willfulness. Therefore, the trial court erred by concluding that there were no issues of fact on the issue of whether the officers' conduct was willful.

{¶ 36} Furthermore, the conduct of the officers may also have been wanton. As we mentioned, wantonness involves failure to use "any" care. In *Hunter v. Columbus* (2000), 139 Ohio App.3d 962, 746 N.E.2d 246, the Tenth District Court of Appeals rejected an argument that an ambulance driver could not be considered to have acted wantonly because he had his lights and sirens running and therefore complied with the requirement of using "any" care. The Tenth District felt this analysis was simplistic, because under that criteria:

{¶ 37} "[Y]ou could drive an emergency vehicle in any manner that you please and not be guilty of wanton or reckless misconduct simply because you activated your siren and lights. Even looking where you are going or applying one's brakes meets the literalistic, but not legal, definition of 'any care.' If 'any care' is construed in that fashion, the exception becomes virtually meaningless." Id. at 970, 746 N.E.2d 246.

{¶ 38} The Tenth District added that a more substantial analysis was needed to decide whether conduct is willful or wanton in relation to whether the probability of harm is great and is known to the tortfeasor. Among the factors the Tenth District considered in deciding whether the probability of harm was great and was known to the tortfeasor was a fire-department rule that required ambulances to go no more than 20 miles per hour when proceeding left of center. At the time of the accident involved in *Hunter*, the ambulance was allegedly traveling 61 miles per hour while going left of center to pass traffic. Id. at 966, 746 N.E.2d 246. The city of Columbus argued that it should not be penalized by a departmental rule that was not required by law and was more strict than the rule followed by many other municipalities. Id. at 970, 746 N.E.2d 246. Although the Tenth District agreed that the departmental rule was not per se determinative, it did say that the rule could be taken into consideration in determining what a reasonable speed might be to protect the safety of all concerned. Id.

{¶ 39} In the present case, we agree with the trial court that there were issues of fact regarding whether the conduct of the officers was willful or reckless. We also believe there were issues of fact concerning whether the officers' conduct was wanton. In this regard, we note that the city has argued that the pursuit policy is irrelevant, and the trial court did, in fact, refuse to consider the policy. The city also claims that the officers used care by activating lights and sirens and by slowing at intersections. However, as *Hunter* stressed, such an analysis is too simplistic. Furthermore, whether particular acts demon-

strate the presence of wantonness, recklessness, or merely negligence is normally a decision for the jury, based on the totality of the circumstances. See *Hunter,* 139 Ohio App.3d at 972, 746 N.E.2d 246, and *Garrison v. Bobbitt* (1999), 134 Ohio App.3d 373, 385, 731 N.E.2d 216. See, also, *Robertson v. Dept. of Pub. Safety,* Ct. of Cl. No. 2001–09214, 2005-Ohio-5069, 2005 WL 2364817, at ¶ 39–42 (finding that an officer acted wantonly in a pursuit where the effectiveness of his warning lights and sirens was minimized by a hill that led up to the intersection where the collision occurred).

{¶ 40} As we mentioned, Smith and Abney were proceeding up a rather steep hill, in a residential area with which they were unfamiliar, knowing that the individual they were pursuing was driving 55 miles per hour and running stop signs. In addition, Chief McManus testified that one of the purposes of the pursuit policy was to avoid an outcome like the one that occurred. In fact, McManus testified that he had even told Abney this at the accident scene. Given the high degree of probability of harm that was known to the alleged tortfeasors, there were also factual issues regarding whether the officers' conduct was wanton. As we said, these are normally matters that are decided by the jury. Whether the trial court's errors require reversal of the summary judgment, however, depends on the resolution of other matters.

{¶ 41} As we noted, the trial court held that issues of reckless (and by implication, wanton) conduct were essentially irrelevant because the officers' actions were not outrageous and extreme, and therefore, did not proximately cause the accident. Plaintiffs criticize this finding because it allegedly creates de facto immunity where none exists. In addition, plaintiffs contend that under *Lewis,* summary judgment could be overcome if the appellant in that case had demonstrated that the police officers had acted wantonly or willfully.

{¶ 42} Upon reviewing *Lewis,* we find the decision somewhat confusing. The facts in *Lewis* are not very detailed, but it appears that the officers observed a vehicle traveling at a high rate of speed and pursued it through business and residential areas until the driver ran a stop sign and struck another car. 75 Ohio App.3d at 455, 599 N.E.2d 814. On appeal, the court first considered proximate cause and held that the pursuit did not proximately cause the plaintiff's injuries because the officers' conduct was not outrageous or extreme. Id. at 456, 599 N.E.2d 814. Because a lack of proximate cause would be fatal to any attempt to hold the city or police officers liable, the court did not need to discuss any further issues. However, the court then considered whether the officers were responding to an emergency and were acting in a willful or wanton matter.

{¶ 43} In this regard, the court decided that the officers were responding to an emergency call. The court then stated that "[h]aving found that the officers were responding to an emergency, appellant may still overcome the summary judg-

ment motion if there exists a genuine issue of material fact whether the officers acted willfully or wantonly in the operation of their motor vehicle." Id. at 457, 599 N.E.2d 814. Ultimately, the court found that the officers' conduct, at most, rose only to the level of negligence and affirmed the summary judgment that had been granted. Id. at 458, 599 N.E.2d 814.

{¶ 44} The plaintiffs in the present case interpret the above-quoted language to mean that recovery would still be allowed under Lewis if there are factual issues as to whether an officer's conduct was wanton or willful. However, we disagree. Logically, the Lewis court had no reason to comment on these points, since it had already decided the issue of proximate cause. Since there must always be a causal connection between disputed conduct and an injury, a plaintiff would have to satisfy proximate-cause requirements even if an officer's conduct is wanton or reckless. Therefore, while the court's comments may be confusing, they cannot overcome the fact that the lack of proximate cause would be fatal.

{¶ 45} Plaintiffs also claim that the proximate-cause holding in Lewis is inapplicable because it is a fiction used by jurisdictions like Wyoming and Tennessee to create the type of immunity that R.C. 2744.02 already provides. In addition, plaintiffs note that some of the authority cited in Lewis has been overturned in favor of a majority trend of providing limited statutory immunity for injuries caused by high-speed pursuits.

{¶ 46} Lewis relied primarily on two cases for its proximate-cause analysis. These cases were DeWald v. State (Wyo.1986), 719 P.2d 643, and Nevill v. Tullahoma (Tenn.1988), 756 S.W.2d 226. In DeWald, the legislature had granted the state immunity from suit, but removed the immunity in cases where an employee was negligent in operating a vehicle. 719 P.2d at 646. This is similar to Ohio's waiver of immunity. However, unlike Ohio, Wyoming did not reinstate immunity in situations where officers are on emergency calls and fail to act recklessly or wantonly. As a result, the trial court in DeWald used common-law principles to find that the police officers would be immune from liability for injuries to a third party caused by an auto they were pursuing, if the officers acted in good faith and reasonably under the circumstances. Id.

{¶ 47} On appeal, the Wyoming Supreme Court disagreed, because good-faith immunity generally applies only to executive-policy decisions, which do not include operational duties like driving a patrol car and deciding whether to pursue or continue pursuit. Unfortunately, this meant that the officers would be left without any immunity for negligent actions. Id. As a matter of public policy, the Wyoming Supreme Court, therefore, decided:

{¶ 48} "[W]hen a police officer pursues a fleeing violator and the violator injures a third party as a result of the chase, the officer's pursuit is not the proximate cause of those injuries unless the circumstances indicate extreme or

outrageous conduct by the officer. To put it another way, the possibility that the violator will injure a third party is too remote to create liability until the conduct of the officer becomes extreme." Id. at 650. The court explained the policy behind rejection of liability:

{¶ 49} " '(1) [I]t is the duty of a police officer to apprehend those whose reckless driving makes use of the highway dangerous to others; (2) the proximate cause of the accident is the reckless driving of the pursued, notwithstanding recognition of the fact that the police pursuit contributed to the pursued's reckless driving.' " Id. at 649, quoting Roll v. Timberman (1967), 94 N.J.Super. 530, 229 A.2d 281.

{¶ 50} At the present time, DeWald is still the law in Wyoming. However, there is no indication that the immunity statute in Wyoming has changed to allow reinstatement of immunity where officers' actions are merely negligent.

{¶ 51} The second case that Lewis cited is Nevill v. Tullahoma (Tenn.1988), 756 S.W.2d 226. In Nevill, the Tennessee Supreme Court found that the sole proximate cause of an accident was the pursued driver's negligence. Several years later, the Tennessee Supreme Court overruled Nevill and chose to follow what it described as a substantial and emerging majority view that rejects "the per se rule of no proximate cause as a matter of law in favor of a rule that allows a jury to decide whether negligent police conduct is the proximate cause of injury to innocent third parties." Haynes v. Hamilton Cty. (Tenn.1994), 883 S.W.2d 606, 612. The Tennessee Supreme Court explained the reason for its change in position as follows:

{¶ 52} "With respect to superseding intervening causes that might break the chain of proximate causation, we have stated:

{¶ 53} "There is no requirement that a cause, to be regarded as the proximate cause of an injury, be the sole cause, the last act, or the one nearest to the injury, provided it is a substantial factor in producing the end result. An intervening act, which is a normal response created by negligence, is not a superseding, intervening cause so as to relieve the original wrongdoer of liability, provided the intervening act could have reasonably been foreseen and the conduct was a substantial factor in bringing about the harm. An intervening act will not exculpate the original wrongdoer unless it appears that the negligent intervening act could not have been reasonably anticipated.* * *

{¶ 54} "Proximate cause, as well as superseding intervening cause, are ordinarily jury questions, unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome. * * *

{¶ 55} "Unlike the *Nevill* court, we are unable to conclude, that in all cases, all reasonable persons must agree, as a matter of law, that the conduct of police in commencing or continuing pursuit is superseded by the negligence of a fleeing suspect. We do not consider it beyond the realm of 'reasonable anticipation' that a suspect, in an attempt to evade high-speed police pursuit, would in turn flee at a high rate of speed and collide with an innocent third party. * * *

{¶ 56} "Moreover, the *Nevill* Court was applying Tennessee law as it existed prior to the 1986 amendment, by which the General Assembly determined that public policy requires that police officers be liable to innocent third parties for negligent conduct which proximately causes injury. The *Nevill* holding was also, in large degree, based on court decisions from other jurisdictions refusing to impose liability on police as a matter of public policy. The *Nevill* Court's analysis included cases from the following states: Kentucky, Missouri, New York, New Jersey, and Florida, most of which were decided more than 25 years ago. Two of those states, New York and Florida, have recently reconsidered the issue and adopted what is now a substantial and emerging majority view, rejecting the per se rule of no proximate cause as a matter of law in favor of a rule that allows a jury to decide whether negligent police conduct is the proximate cause of injury to innocent third parties." Id.

{¶ 57} Although the analysis in *Haynes* has some force, Ohio appellate districts, including our own, have continued to apply the "no proximate cause" holding of *Lewis* to cases where pursuits end in injury to innocent third parties or to occupants of the pursued vehicle without direct contact with a police vehicle. See, e.g., *Jackson v. Poland Twp.* (Sept. 29, 1999), Mahoning App. Nos. 96 CA 261, 97 CA 13, and 98 CA 105, 1999 WL 783959 (finding no proximate cause where pursued vehicle crashed into tree, killing passenger); *Heard v. Toledo*, Lucas App. No. L–03–1032, 2003-Ohio-5191, 2003 WL 22233790, at ¶ 11–12 (finding no proximate cause where third party was killed in collision with pursued vehicle, and rejecting argument that *Lewis* is "outdated"); *Pylypiv v. Parma*, Cuyahoga App. No. 85995, 2005-Ohio-6364, 2005 WL 3220240, at ¶ 33 (pursuit was not proximate cause of accident that killed two persons on motorcycle that was being pursued); and *Shalkhauser v. Medina*, 148 Ohio App.3d 41, 2002-Ohio-222, 772 N.E.2d 129, at ¶ 45–49 (Ninth District Court of Appeals follows its prior decision in *Lewis* and finds no proximate cause where pursued vehicle collided with third party).

{¶ 58} In *Sutterlin v. Barnard* (Oct. 6, 1992), Montgomery App. No. 13201, 1992 WL 274641, our own district followed the approach taken in *Lewis*. The pursuit in *Sutterlin* took place over one mile and lasted about one minute, after which the pursued vehicle hit a third party. Id. at *1. We affirmed the

summary judgment in favor of the defendants because we found no evidence that the officer's conduct was either extreme or outrageous. Id. at *4.

{¶ 59} Because *Lewis* has been previously followed by our district and by other Ohio appellate districts, we feel we must adhere to the established law. Accordingly, we must affirm the trial court's decision unless there are genuine issues of material fact regarding whether the conduct of Abney and Smith was outrageous or extreme. The Ohio Supreme Court has described such conduct as follows:

{¶ 60} "[S]o outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 375, 6 OBR 421, 453 N.E.2d 666.

{¶ 61} After applying this standard to the facts of the present case, and construing the facts most favorably for the plaintiffs, we hold that Abney's and Smith's conduct could not fairly be characterized as "atrocious and utterly intolerable in a civilized community." Obviously, this is an exceptionally difficult standard to meet. Accordingly, the trial court correctly granted summary judgment on the lack of proximate cause.

{¶ 62} Based on the preceding analysis, the first and second assignments of error are without merit and are overruled.

## II.

{¶ 63} The third and fourth assignments of error concern coverage issues under a policy of automobile insurance issued by State Farm Mutual Automobile Insurance Company ("State Farm"). At the time of the accident, Bailey was insured by State Farm and was driving an automobile that he did not own. State Farm filed a motion to intervene in the pending tort action against Bailey, claiming that there was no coverage for the accident. Subsequently, the trial court granted summary judgment to State Farm for two reasons. The court first found that liability coverage did not exist because the Delta 88 was a "temporary substitute car" and Bailey did not have consent from the owner to operate the vehicle. The court then concluded that Bailey had failed to give State Farm timely notice of the accident and that State Farm was prejudiced because the Delta 88 was destroyed before State Farm could inspect it for physical signs of theft.

{¶ 64} In the third and fourth assignments of error, plaintiffs challenge the trial court's decision on the following grounds:

{¶ 65} "III. The trial court erred in finding that the Oldsmobile Alero was in the shop at the time of the August 16, 2002 accident.

{¶ 66} "IV. The trial court erred in granting summary judgment to State Farm on the basis that four months was an unreasonable delay in giving notice of the accident and on the basis that State Farm was prejudiced as a result."

{¶ 67} At the outset, we should stress that the evidence contains many contested factual issues regarding Bailey's possession of the Delta 88. However, a few points are not disputed. One such point is that the Delta 88 was titled to Gwen Albers at the time of the accident on August 16, 2002. Gwen and her husband, Cletus Albers II, lived in Ashland County, Ohio. In June, 2002, Gwen allowed her son, Cletus III (also known as C.J.), to bring the Delta 88 to Dayton. Gwen told C.J. that no one else was permitted to drive the car. Also undisputed is the fact that Bailey did not know Gwen Albers and did not have Gwen's permission to drive the Delta 88.

{¶ 68} Another undisputed fact is that at the time of the accident, Jerrold Bailey and his wife, Angela Siwecki, were named insureds on State Farm Policy No. C16 5212–F22–35D, with liability limits of $100,000 per person and $300,000 per accident. The auto listed on the policy is a 1996 Pontiac Grand Am, which was titled only in Angela's name. Angela drove the Grand Am, and Bailey drove a 2002 Alero Oldsmobile. Although Angela had cosigned for the loan on the Alero and the title was in both their names, Bailey was the one who primarily drove the Alero.

{¶ 69} Both Angela and Bailey testified that the Alero was also insured with State Farm. However, coverage on that vehicle expired on August 8, 2002, for nonpayment of premiums.

{¶ 70} Most of the remaining matters about Bailey's use of the Delta 88 are disputed, due to conflicts in the evidence. The evidence, construed most strongly in Bailey's favor, reveals that after leaving Ashland County, C.J. came to Dayton, Ohio, to work with his uncle, Tom Smith, who owned part of a company called Smith Industries. C.J. brought the Delta 88 to Dayton with him. At first, C.J. lived with his uncle and aunt, but in mid-July, Smith and C.J. moved out of the house. From that time on, they lived in various hotels, including the Extended Stay America Hotel in Centerville, Ohio, which is where they lived between late July and the date of the accident. A woman named Kathy Teegarten also frequently stayed with Smith at the hotels. Bailey met Smith through Teegarten and had known Smith for about six months before the accident.

{¶ 71} There were disputes about exactly what was going on at the hotels. Bailey claimed that he had "partied" with Smith and C.J. many times at the Extended Stay. Ironically, both Smith and C.J. denied having any relationship

with Bailey. Instead, they pinned the relationship on each other. We should note that the inconsistencies in the testimony of these two individuals are too numerous to mention. For example, Smith testified that between August 1, and August 16, 2002, he, C.J., and Teegarten used cocaine daily at the hotel. During this time period, Smith bought cocaine off the streets. When Smith ran out to get cocaine, he usually took his truck, which had special license plates and was a vehicle with which he could be readily identified. Smith also said he had never bought C.J. any alcohol. In contrast, C.J. testified that he never used cocaine with Smith and that Smith had purchased beer for him.

{¶ 72} Other inconsistencies involve the testimony of the two men about their relationships with Bailey. For example, Smith testified that he came in contact with Bailey only a few times. The first time was about a week before August 16, 2002, when he found Bailey in the hotel with C.J. and Teegarten. Smith claimed he did not like Bailey and asked Bailey to leave. The second contact was a few days before the accident, when Smith found out that C.J. had lent Bailey the Delta 88. Smith was upset with C.J. for lending Bailey the car. When Smith asked C.J. why he had lent the car, C.J. told him that he had gotten either drugs or money from Bailey.

{¶ 73} In contrast, C.J. denied ever meeting Bailey. He said Smith might have known Bailey, and he did not know what kind of a deal his uncle may have worked out with Bailey.

{¶ 74} The testimony of Bailey and his wife paints a quite different picture. Bailey testified that he was under the impression that Smith had purchased the Delta 88. He described it as "Tom's car." When the accident occurred, Bailey had been driving the Delta 88 for about a week. Previously, on July 30, 2002, Bailey's Alero was towed to a BP ProCare due to a problem with the brakes. Smith agreed to pay for getting the brakes fixed. When the Alero got fixed, Smith was going to use the Alero for business trips. When Smith finished up his business, Bailey was going to get the Alero back.

{¶ 75} The Alero was fixed and operable by August 5, 2002. At the time of the accident 11 days later, Smith had possession of the Alero, and Bailey was driving the Delta 88. In the few weeks before the accident, Bailey drove the Delta 88 all over Dayton, taking his wife to work and doing things like that. Bailey said he had the keys to the car and could use it whenever he wanted.

{¶ 76} Angela Siwecki was not involved with any of these people, other than being married to Bailey. During the summer of 2002, Angela was pregnant and was working as a lab technician at a local hospital. Bailey was not employed, and Angela found out in July that he was addicted to drugs. Before the day of the accident, Smith had called the house a number of times and had left messages that included his name. Smith came into the house once and came by a few other

times to pick up Bailey. Angela believed the relationship between Bailey and Smith was a drug affiliation, i.e., they were smoking crack cocaine together. She believed they were using, not selling.

{¶ 77} When the brakes went out on the Alero, Bailey told Angela that his friend would pay for the brakes if they let him use the Alero for a week or two. Bailey then told Angela that Smith had paid for the Alero and had gotten it out of the shop. In exchange, Smith was going to let Bailey use the Delta 88. Angela saw Bailey with keys, and he said they were to the Delta 88. She saw Bailey and his brother, Greg Hobson, in the Delta 88 several times before the day of the accident. Angela believed they were partying and using drugs a lot that summer and were not going to work.

{¶ 78} On the day of August 16, 2002, Bailey had the Delta 88. He took Angela to work and took Angela's son to daycare. He was then driving around Dayton with his brother, Greg, when he encountered the police and the chase ensued. At the time, Smith and C.J. were at the Extended Stay Hotel. Smith indicated that he and C.J. had been doing cocaine for the 48 hours before the accident.

{¶ 79} Again, there were numerous inconsistencies in the testimony of C.J. and Smith about events that occurred the day of the accident. For example, C.J. testified that the two men went to McDonald's around 11:00 a.m. on August 16, that he watched football alone in his room, and that he did not leave his room until around 5:30 a.m. the following day, when his uncle received a call about the accident. In contrast, Smith said that he and C.J. had gone to Burger King around 5:30 p.m. and returned to the hotel around 6:00 p.m. on August 16, 2002. When they returned, the Delta 88 was in the hotel parking lot. Smith also said that he and C.J. both went back to Smith's room and were there for the rest of the evening. Smith was awakened around 3:00 a.m. the next morning, by a phone call from C.J.'s parents, who had been told by the police that the Delta 88 was involved in an accident and that there was a fatality. Subsequently, C.J. and Smith told the police that the Delta 88 had been stolen.

{¶ 80} After reviewing all the depositions, a reasonable inference can be drawn that Smith paid for the repairs to Bailey's car and lent the Delta 88 to Bailey so that Smith could use the Alero rather than his own recognizable vehicle when he purchased drugs. We should also note that the documentary evidence supports Bailey's claims about the Delta 88. For example, an affidavit from the manager of the ProCare where the Alero was repaired states that the repairs were completed on August 5, 2002, and that Tom Smith paid the $849.92 invoice for the repairs on that date by credit card, under the business name of Tom Smith, Inc. Smith himself testified that he "could" have paid for the repairs to Bailey's car. Furthermore, Angela's undisputed testimony is that she called Smith a few days after the accident to arrange to get the Alero back. On Sunday, August 18, 2002,

Angela went to a hotel in Vandalia to which Smith had moved after the accident. Smith came out of the hotel, gave Angela the keys to the Alero, and took things out of the Alero that belonged to him, like CDs.

{¶ 81} The insurance policy that State Farm issued to Bailey provides liability coverage for the use, "by an insured, of a newly-acquired car, a temporary substitute car or a non-owned car." In granting summary judgment for State Farm, the trial court found that the Delta 88 was a temporary substitute vehicle and was not a non-owned vehicle. The reason the court gave for this finding was that Angela and Bailey had stated in their depositions that both the Alero and the Grand Am were disabled at the time of the accident and that the Delta 88 was being used as a replacement car. However, this was an incorrect factual finding. It is true that the Grand Am was inoperable at the time of the accident. However, the Alero was not disabled at the time of the accident, and Bailey testified that he was using the Delta 88 because Smith was using the Alero.

{¶ 82} The trial court also found that there was no coverage for the use of the Delta 88 as a temporary substitute vehicle because Bailey did not have the consent of the actual owner, Gwen Albers. There is obviously no dispute about this fact, because Bailey and Gwen Albers did not even know each other.

{¶ 83} Under the State Farm policy, a temporary substitute car is defined as:

{¶ 84} "a *car* not owned by, registered to or leased to you or your spouse, if it replaces *your car* for a short time. Its use has to be with the consent of the owner. *Your car* has to be out of service due to its breakdown, repair, servicing, damage or *loss*. A *temporary substitute car* is not considered a *non-owned car*." (Emphasis sic.)

{¶ 85} "Your car" is defined by the policy as "the car or the vehicle described on the declarations page." Consequently, for coverage to exist under the policy for use of a temporary substitute car, the car listed on the declarations page (the 1996 Grand Am) must have been out of service, the car being used as a temporary substitute vehicle (the Delta 88) must have been replacing the Grand Am for a short time, and the use must have been with the consent of the owner. As we said, Bailey's testimony was that he was using the Delta 88 because Smith had his Alero. Therefore, the Delta 88 was not a temporary substitute vehicle.

{¶ 86} The State Farm policy also provided liability coverage for the use of non-owned cars, which are defined as:

{¶ 87} " 'a *car* not owned by, registered to, or leased to:

{¶ 88} "1. *You, your spouse*;

{¶ 89} "2. Any relative * * *;

{¶ 90} "3. Any other person residing in the same household as you, your spouse or any relative, or

{¶ 91} "4. An employer of you, your spouse, or any relative.

{¶ 92} " * * *

{¶ 93} *"Non-owned car* does not include a *car* which has been operated or rented by or in the possession of *an insured* during any part of the last 21 or more consecutive days. If the *insured* is an *insured* under one or more other car policies issued by us, the 21 day limit is increased by an additional 21 days for each such additional policy.

{¶ 94} "A *non-owned car* must be a *car* in the lawful possession of the *person* operating it.' "

{¶ 95} "You" is defined by the policy as "the named insured or named insureds shown on the declarations page." Bailey was listed as a named insured on the declarations page, so he would have been included within this definition.

{¶ 96} Thus, in order for the Delta 88 to be considered a non-owned car, it must not have been owned by, leased to, or registered to Bailey. In addition, Bailey must not have operated the Delta 88 during any part of the last 21 or more consecutive days before the accident. And finally, Bailey must have had lawful possession of the Delta 88.

{¶ 97} There is no dispute about the fact that Bailey did not lease or own the Delta 88, nor is there any dispute that the Delta 88 was registered to Gwen Albers, not Bailey. The facts that were submitted on summary judgment also indicate that Bailey had driven the Delta 88 only for a week or two before the accident, not for 21 or more consecutive days. And finally, if the facts are construed in Bailey's favor, as they must be, Bailey had lawful possession of the Delta 88.

{¶ 98} The policy does not specifically define "lawful possession," but the Ohio Supreme Court has said that "[w]here the term, 'theft,' is used but not defined in an insurance contract drafted by the insurer, it includes any wrongful deprivation of the property of another without claim or color of right." *Munchick v. Fid. & Cas. Co. of New York* (1965), 2 Ohio St.2d 303, 306, 31 O.O.2d 569, 209 N.E.2d 167, at paragraph two of the syllabus. Applying the same reasoning, we conclude that lawful possession would mean that the individual exerting control over the property had a claim or color of right, or, in other words, a reasonable belief that he or she was entitled to use the property.

{¶ 99} Notably, State Farm specified that the use of temporary substitute automobiles had to be with the consent of the owner, but did not include the same language when referring to non-owned automobiles. The

principle is well established that insurers are bound by the provisions they choose to include in their policies. *Allstate v. Boggs* (1971), 27 Ohio St.2d 216, 56 O.O.2d 130, 271 N.E.2d 855. Furthermore, where the meaning of terms is doubtful, uncertain, or ambiguous, the contract will be construed against the insurer. Id. at paragraph one of the syllabus. Accord, *Munchick*, 2 Ohio St.2d at 303, 31 O.O.2d 569, 209 N.E.2d 167.

{¶ 100} When the facts are construed in Bailey's favor, there are genuine issues of material fact regarding whether Bailey reasonably believed that he was in lawful possession of the Delta 88 at the time of the accident. Accordingly, the trial court erred in finding that no coverage existed because the Delta 88 was a temporary substitute automobile. Instead, the Delta 88 was a "non-owned car" as defined by the policy, and there were factual issues regarding whether Bailey was in lawful possession of the car.

{¶ 101} Based on the preceding discussion, the third assignment of error is sustained.

### III

{¶ 102} As we mentioned, an additional basis for denial of coverage was that Bailey failed to give State Farm timely notice of the accident and that State Farm was prejudiced as a result. In this regard, the policy provides that the insured is to give State Farm or its agents written notice of an accident or loss "as soon as reasonably possible." State Farm was notified of a potential claim on December 12, 2002, or about four months after the accident, by plaintiff's counsel. Bailey himself has never provided State Farm with written notice.

{¶ 103} About two weeks after State Farm was notified, its claims representative, Howard Titus went to Coffey's Towing, where he was told that the company did not have the Delta 88, but would contact him when it was able to locate the car. Subsequently, on February 26, 2003, Titus went to Adkins Auto Parts, where he learned that the car had been destroyed. Titus stated that the car had been destroyed before it could be inspected for physical signs of theft.

{¶ 104} In moving for summary judgment, State Farm claimed material prejudice because it could not inspect the vehicle for physical signs of theft. The trial court agreed and granted summary judgment for State Farm on this basis.

{¶ 105} To decide whether a trial court has properly granted summary judgment, we review the decision de novo, which means that "we apply the standards used by the trial court." *Brinkman v. Doughty* (2000), 140 Ohio App.3d 494, 496, 748 N.E.2d 116. Trial courts will appropriately grant summary judgment when they find "(1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3)

that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor." *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 375 N.E.2d 46.

{¶ 106} After construing the facts in Bailey's favor, we hold that summary judgment was improperly granted to State Farm. In *Ferrando v. Auto–Owners Mut. Ins. Co.*, 98 Ohio St.3d 186, 2002-Ohio-7217, 781 N.E.2d 927, the Ohio Supreme Court held that a two-step test should be used to determine whether late notice to the insurer is a breach justifying denial of coverage. The court commented:

{¶ 107} "The two-step approach in late-notice cases requires that the court first determine whether the insured's notice was timely. This determination is based on asking whether the * * * insurer received notice "within a reasonable time in light of all the surrounding facts and circumstances. * * * If the insurer did receive notice within a reasonable time, the notice inquiry is at an end, the notice provision was not breached, and * * * coverage is not precluded. If the insurer did *not* receive reasonable notice, the next step is to inquire whether the insurer was prejudiced. Unreasonable notice gives rise to a presumption of prejudice to the insurer, which the insured bears the burden of presenting evidence to rebut." (Emphasis sic.) Id. at ¶ 90.

{¶ 108} In *Ferrando*, the insurer was not notified of an accident for about three and one-half years. Id. at ¶ 6. Despite this lengthy delay, the Ohio Supreme Court refused to establish a rule that delays of a particular length of time are unreasonable. The court also held, under the specific facts of the case, that the delay was not unreasonable as a matter of law. Id. at ¶ 93.

{¶ 109} In the present case, neither the parties nor the trial court focused on any facts and circumstances that may have been involved in the delayed notice. Instead, the only issue considered was whether a lack of notice had prejudiced State Farm. On appeal, plaintiffs claim that Bailey was significantly injured in the auto accident and was jailed as soon as he was released from the hospital. Plaintiffs' attorneys also claim in their brief that they met with Bailey on November 25, 2002, while he was confined in jail. At that time, Bailey allegedly asked the attorneys to give State Farm written notice of the accident. These facts may be true, but they are not in the record.

{¶ 110} The trial court cannot be faulted for failing to consider matters that the parties did not address. Nonetheless, State Farm had the initial burden of showing in its motion that there were no genuine issues of fact and that it was entitled to judgment as a matter of law. This could not be done by avoiding the

subject entirely or by making conclusory statements. See *Yates v. Allstate Ins. Co.*, Licking App. No. 04 CA 39, 2005-Ohio-1479, 2005 WL 724499, at ¶ 20–22 (holding that summary judgment was improperly granted in the insurer's favor when the insurer failed to demonstrate that a delay of seven months was unreasonable under the facts and circumstances, beyond simply making a conclusory statement that the delay was unreasonable).

{¶ 111} We should stress that we are not holding that a four-month delay is reasonable as a matter of law. We do note that the cases have typically involved much longer delays. See, e.g., *Westfield Ins. Co. v. Russo*, 164 Ohio App.3d 533, 538, 2005-Ohio-5942, 843 N.E.2d 205, at ¶ 15 (insured agrees that eight-year delay is unreasonable); *Mackin v. Am. States Ins. Co.*, Lucas App. No. L–03–1216, 2004-Ohio-1335, 2004 WL 546956, at ¶ 12 (13–year delay unreasonable on its face); and *McCauley v. Great Am. Alliance Ins. Co.*, Montgomery App. No. 19898, 2003-Ohio-5527, 2003 WL 22359653, at ¶ 24–25 (delay of three years after *Scott–Pontzer v. Liberty Mut. Fire Ins. Co.* (1999), 85 Ohio St.3d 660, 710 N.E.2d 1116, was decided and one year after insured learned of potential claim was unreasonable delay).

{¶ 112} In *Parker v. Buckeye Union Ins. Co.*, Miami App. No. 2002–CA–55, 2003-Ohio-2400, 2003 WL 21060829, an auto accident occurred in 1989, and the insured did not report the claim to the insurer for around 12 years, which was also more than a year and a half after *Scott–Pontzer* was decided. Id. at ¶ 38. We reversed the summary judgment in favor of the insurer and remanded the case, because the trial court had not conducted the two-step analysis set out in *Ferrando*. Id. at ¶ 44.

{¶ 113} In view of some very lengthy delays found in the case law, a four-month delay does not seem particularly significant—at least in the absence of specific discussion of the facts and circumstances surrounding the delay. The delay would also seem insignificant since liability for the accident was not disputed. Accordingly, we conclude that State Farm failed to meet its burden in moving for summary judgment, and the burden never shifted to Bailey or to plaintiffs. *Yates*, 2005-Ohio-1479, at ¶ 20.

{¶ 114} Because the trial court also made a finding on the issue of prejudice, we will briefly consider that point. In *Ferrando*, the Ohio Supreme Court said that an insured's breach of a notice provision is "presumed prejudicial to the insurer absent evidence to the contrary." *Ferrando*, 98 Ohio St.3d 186, 2002-Ohio-7217, 781 N.E.2d 927, at ¶ 88. As we mentioned, the trial court found the delay prejudicial because State Farm was not able to inspect the vehicle for physical signs of theft. However, this conclusion does not correspond to the facts of the case. As a preliminary point, we note that State Farm did not say what physical signs of theft were being sought, nor did State Farm advance any reason

why there would be such signs. Instead, the record contains only a conclusory statement from a claims representative, indicating that he was unable to inspect the vehicle for physical signs of theft. More importantly, the record is devoid of any indication that physical signs of theft would have been present.

{¶ 115} We have already said that the documentary evidence casts doubt on the credibility of C.J. Albers and Tom Smith and their claim that the car was stolen. However, even if we assume that these individuals were being truthful, C.J. said that he had left the keys in the car and had left the car unlocked. Bailey also testified that he had the keys to the car. And finally, C.J. testified that the towing company had the keys to the car after the accident. In fact, C.J. said that he retrieved his prom picture, which was on the key ring, and the tow yard kept the key ring. Consequently, we are at a loss to understand (and State Farm did not specify) what physical signs of theft might have been present.

{¶ 116} Even if the delay were unreasonable, there were genuine issues of material fact regarding whether the car was stolen, and if so, why the failure to physically inspect the vehicle for theft would have prejudiced State Farm. The trial court, therefore, erred in granting summary judgment in favor of State Farm, and the fourth assignment of error is sustained.

{¶ 117} In light of the preceding discussion, the first and second assignments of error are overruled, and the third and fourth assignments of error are sustained. Accordingly, the judgment in favor of defendants is affirmed. The judgment in favor of intervening plaintiff, State Farm, is reversed, and this matter is remanded for further proceedings.

> Judgment affirmed in part
> and reversed in part,
> and cause remanded.

WOLFF and GLASSER, JJ., concur.

GEORGE GLASSER, J., retired, of the Sixth Appellate District, sitting by assignment.

BROGAN, J., concurs in part and dissents in part.

BROGAN, J., concurring in part and dissenting in part.

{¶ 118} While I concur with the majority's well-reasoned discussion of insurance coverage, I dissent from the decision on proximate cause. Accordingly, I would reverse the summary judgment in favor of the city and its police officers. In this regard, I agree with the dissenting judge in *Lewis,* who argued that "multiple actors may combine to provide causation in a given instance." *Lewis,* 75 Ohio App.3d at 459, 599 N.E.2d 814 (Cacioppo, J., dissenting).

{¶ 119} Because Ohio follows the rule outlined in *Lewis,* I will briefly refer to the law of other jurisdictions. Like Ohio, Maryland has a statute that waives immunity for damages caused by the negligent operation of vehicles of governmental employees. See *Boyer v. State* (1991), 323 Md. 558, 565, 594 A.2d 121. In *Boyer,* Maryland's highest court found that police officers owed a duty of care to an injured third party when they engaged in a high-speed chase of an allegedly intoxicated driver. Accordingly, the court refused to follow cases holding that the officers' negligence was not the proximate cause of the injury. In this regard, the court observed:

{¶ 120} "The cases asserting lack of proximate cause, however, overlook the fact that there can be more than one cause of an injury. It is entirely foreseeable under certain circumstances that a police officer's engagement in a high-speed chase could be a proximate cause of an injury to a third party struck by the pursued suspect. As some text writers have pointed out, an analysis involving proximate cause or intervening or superseding cause may not be appropriate in the type of case we have before us." Id. at 587, 594 A.2d 121, fn. 18.

{¶ 121} As the Tennessee Supreme Court noted in *Haynes,* a substantial majority of jurisdictions now reject the rule of "no proximate cause." *Haynes v. Hamilton Cty.* (Tenn.1994), 883 S.W.2d 606, 612. I agree with the majority view.

{¶ 122} The United States Supreme Court has said that "the use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape." *Tennessee v. Garner* (1985), 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1. *Garner* involved a fleeing felony suspect who was fatally shot by a officer in order to prevent the suspect's escape. Although the circumstances are somewhat different in the present case, I see little distinction between a bullet and a fleeing car that is being pursued. In both cases, deadly force is set in motion, and the probability is extremely high in pursuit cases that the chase will end in death or injury of the persons in the fleeing car, or of innocent third parties, or both.

{¶ 123} My research has disclosed many cases in Ohio alone where pursuits have ended in terrible crashes. This is an outcome that surely can be predicted, since such accidents happen with regularity when pursuit occurs. If police officers are not permitted to use deadly force and shoot fleeing felons, I see no reason they should be allowed to do essentially the same thing by engaging in high-speed pursuits. Indeed, one could make the argument that high-speed pursuits pose more inherent danger to the general public. Generally, officers hit individuals at whom they aim guns, but they rarely shoot innocent bystanders.

{¶ 124} After reviewing the Ohio cases that have applied *Lewis,* I have trouble visualizing any set of circumstances in which an officer's conduct would ever be

considered outrageous, short of deliberately running a pursued car off the road or into another vehicle. I am compelled to this conclusion because I have not been able to find an Ohio case in which an officer's conduct has been held outrageous or extreme, regardless of the circumstances of the pursuit. If courts intend to hold officers immune regardless of their conduct, we might as well admit that fact and concede that the exception to immunity is simply a convenient fiction. Accordingly, I dissent from the court's opinion on proximate cause.