OPINION *Page 2 
{¶ 1} Danielle Nolan, a minor, appeals by and through her mother, Jacqueline Ritchie, from the trial court's entry of summary judgment in favor of defendant-appellee Jason Turner on the basis of R.C. Chapter 2744 immunity.
 {¶ 2} In her sole assignment of error, Nolan contends genuine issues of material fact exist as to whether Turner's actions in connection with a residential lead-abatement project were reckless, rendering summary judgment on the basis of immunity improper. Nolan advances three specific arguments under her assigned error. First, she claims the trial court erred in considering several instances of alleged misfeasance by Turner in isolation rather than cumulatively. When viewed in the aggregate, Nolan argues that Turner's actions were reckless. Second, she contends the trial court erred in implicitly concluding that no reasonable juror could find in her favor on the issue of recklessness. Third, she asserts that the trial court erred in applying an incorrect standard to determine what constitutes reckless behavior.
 {¶ 3} The present appeal stems from lead-abatement work performed in 1997 at 26 Simms Street, a residence co-owned by Douglas Holt. At that time, Holt lived in the home with his wife, Jamie, and his two children, ages three and eight. After discovering in 1996 that the younger child had a moderately elevated blood-lead level, Jamie Holt contacted the Montgomery County Combined Health District ("MCCHD"). Although the child's blood-lead level was not high enough to mandate an investigation, MCCHD had obtained a grant that provided funding for a residential lead assessment at any homeowner's request. Pursuant to this program, MCCHD employee Doug Dyer conducted an assessment at Holt's residence in July 1996. It involved using an x-ray fluorescence machine to shoot gamma rays into painted surfaces to test for the presence *Page 3 
of lead. It also involved performing dust sampling by wiping surfaces to collect dust and sending the samples to Cincinnati for testing. At the same time or shortly thereafter, soil samples were collected under a backyard swing and in another play area. Test results indicated the presence of lead paint at various locations in the interior and exterior of the house. The results also indicated elevated lead levels in the soil samples. In August 1996, Dyer prepared an inspection report that detailed the findings. The Holts received a copy of the report with recommendations from Dyer in September 1996.
 {¶ 4} MCCHD also forwarded a copy of Dyer's inspection report to CityWide Development Corporation employee Jaslyn Simon. After reviewing the report, Simon was responsible for preparing specifications setting forth the work required to make the Holts' home lead safe. Simon then obtained MCCHD's necessary approval of his specifications and solicited bids from contractors to perform the work. CityWide employee Dee Several ultimately selected Keen Cross, Inc. as the contractor for the Holts' home. Keen Cross employee Paul Axt supervised a portion of the work, which took place in late 1997 and involved, inter alia, replacing certain items inside the house and scraping loose paint before applying a special encapsulant both inside and outside the house to cover lead-based paint. The encapsulant itself then was painted over with ordinary paint. Pursuant to a change order approved by MCCHD, Keen 
Cross also placed plastic and mulch in an area of the yard to cover paint chips in the soil.
 {¶ 5} Appellee Turner was responsible for performing a final inspection of the work, and he did so in December 1997. Turner examined the home to determine whether the work performed by Keen Cross complied with the specifications. He performed a visual examination and collected dust samples, which were sent to Cincinnati and found to be within acceptable limits. The work performed at the Holts' home passed Turner's *Page 4 
inspection. MCCHD subsequently issued a certificate of clearance, and CityWide authorized payment to Keen Cross.
 {¶ 6} Appellant Nolan and her mother, Jacqueline Ritchie, moved into the residence at 26 Simms Street in September 1999 after the Holts divorced. Nolan and Ritchie moved out of the residence sometime between June and October 2000. Nolan was diagnosed with lead poisoning in October 2000. After dismissing a prior lawsuit under Civ. R. 41(A)(1)(a), Nolan brought the present lawsuit by and through her mother in June 2006. In an amended complaint, she named Turner as a defendant. He moved for summary judgment on the basis that he was immune from liability under R.C. 2744.03(A)(6) and on the basis that Nolan could not establish causation. The trial court sustained the motion on the basis of immunity in a February 26, 2008 decision, order, and entry that contained the requisite Civ. R. 54(B) certification.
 {¶ 7} On appeal, Nolan contends the trial court erred in finding Turner entitled to immunity from liability for his actions in connection with the lead-abatement project. She argues that genuine issues of material fact exist as to whether Turner acted recklessly, thereby depriving him of immunity. Therefore, she asserts that the trial court erred in entering summary judgment under Civ. R. 56(C), a decision we review de novo. Seifke v. Bond, Montgomery App. No. 22333,2008-Ohio-4146, ¶ 12.
 {¶ 8} The parties do not dispute that Turner, who worked for MCCHD, was an employee of a political subdivision. As such, he was immune from liability for harm caused by his acts or omissions in connection with the work performed at 26 Simms Street unless he acted with a malicious purpose, in bad faith, or in a wanton or reckless manner. R.C. 2744.03(A)(6)(b). Nolan does not assert that Turner acted with malice, in bad faith, or wantonly. Instead, she contends a trier of fact reasonably could find that he *Page 5 
acted recklessly. "An individual acts `recklessly' when he `does an act or intentionally fails to do an act which is in his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.'" Hunter v. Columbus (2000), 139 Ohio App.3d 962,969; Carder v. Kettering, Montgomery App. No. 20219, 2004-Ohio-4260, ¶ 22.
 {¶ 9} Nolan first argues that certain acts of alleged misfeasance by Turner, when viewed collectively, create a jury question on the issue of recklessness. Specifically, she points to: (1) his failure "to include soil abatement in the specifications or to conduct post-abatement soil analysis," (2) his failure "to determine whether the door casings had been replaced in accordance with the contract specifications" when performing his final inspection, (3) his "utterly implausible" claim that he received lab test results back from Cincinnati within fourteen minutes of sending the samples, and (4) his failure to prepare a clearance report after his final inspection of the property. Nolan contends these shortcomings by Turner, and his admitted knowledge that children could be harmed if he performed his job incorrectly, raise a genuine issue of material fact as to whether he acted recklessly. (Appellant's brief at 12-13).
 {¶ 10} Upon review, we find the foregoing argument to be without merit. With regard to the work specifications, CityWide employee Jaslyn Simon was responsible for drafting them based on the results of the initial assessment conducted by MCCHD employee Doug Dyer.
 {¶ 11} Notably, however, Simon testified that appellee Turner was required to approve the specifications on behalf of MCCHD before they could be submitted to *Page 6 
contractors for bids. (Simon depo. at 21, 33, 70, 105-106). Therefore, a trier of fact could find that Turner was responsible for the content of the specifications.
 {¶ 12} Notwithstanding the foregoing conclusion, the evidence establishes that it was not necessary for the work specifications to include soil abatement or for post-abatement soil analysis to be done. Turner testified that accepted protocol only requires soil samples to be taken in bare spots where there is exposed dirt. (Turner depo. at 23-24, 71). Nolan's own expert, Richard Baker, agreed that soil testing normally is done in "bare soil areas." (Baker depo. at 90). This is so because dirt is less hazardous when it is covered with grass or something else that prevents children from getting their hands on it. (Turner depo. at 23-24, 71; Baker depo. at 90).
 {¶ 13} As set forth above, the record reflects that soil samples were collected under a backyard swing and in a play area around the time that Dyer conducted his July 1996 initial assessment. Test results obtained in August 1996 revealed elevated lead levels in these areas. (Turner depo. at 44-45). In response to a letter from Dyer, the Holts "completely covered the entire backyard area underneath the swing set and the play area in the backyard of 26 Simms Street, Dayton, Ohio, with mulch." (Doc. #196, Exh. A, Holt affidavit at ¶ 2). After the Holts took this action, which was long before Nolan and Ritchie moved into the home, "[t]here was not any bare dirt beneath the swing set or in the play area," and these locations remained covered with mulch and grass at all relevant times. (Id.). Likewise, "[w]hen Keen Cross completed its work at 26 Simms Street in December of 1997, the entire front, back and side yards of 26 Simms Street were covered with grass or mulch and remained that way until [Douglas Holt] moved out of 26 Simms Street in 2001. There was not any bare or exposed soil." (Id. at ¶ 4).
 {¶ 14} The record reflects that using mulch to cover soil contaminated with lead *Page 7 
paint is an acceptable method of addressing the hazard. (Baker depo. at 56; Simon depo. at 114-115; Cross depo. at 98). Because the Holts handled covering all bare areas themselves, there was no need for the work specifications to require Keen Cross to perform soil abatement. Nor was there any need for Turner to perform soil testing during his final clearance. When asked why he did not test any soil at that time, he responded: "The area must have been covered. You don't have to test the soil if the area is covered." (Turner depo. at 71). This testimony is consistent with Douglas Holt's averment that he covered all bare areas with mulch himself. On appeal, Nolan cites no evidence to controvert Holt's testimony that all bare areas were covered or Turner's testimony that testing covered areas is unnecessary. Therefore, we see no genuine issue of material fact as to whether Turner acted recklessly in failing to include soil abatement in the specifications or to conduct post-abatement soil analysis.
 {¶ 15} During oral argument, counsel for Nolan raised an additional but related issue concerning the presence of paint chips in the yard at 26 Simms Street. Although the factual section of Nolan's appellate brief alleges the presence of paint chips, the argument portion of both her appellate brief and her summary judgment filing contains no reference whatsoever to paint chips. Instead, as set forth above, her argument below and on appeal focuses solely on the condition of the soil after it was discovered that soil samples taken from two specific locations tested positive for lead. Nolan's summary judgment filing and her appellate brief are devoid of any argument that Turner acted recklessly by granting final approval without first requiring paint chips to be picked up on the lawn. This may be because Ritchie denied in her deposition that the legal claims she had filed on behalf of her daughter were based on the presence of paint chips in the yard. (Ritchie depo. at 98-99). Instead, she claimed that the lead poisoning came from inside *Page 8 
the house. (Id. at 105). Nolan cannot raise a paint-chip issue, which the trial court had no opportunity to address, for the first time on appeal. Stanley v. City of Miamisburg (Jan. 28, 2000), Montgomery App. No. 17912.
 {¶ 16} In any event, we would find Turner entitled to summary judgment even if the paint-chip issue were properly before us. As part of the project at 26 Simms Street, MCCHD required mulch to be placed in a certain area of the yard, possibly a flower bed where there were some paint chips in dirt. (Cross depo. at 39, 95, 98-99, 105-106; Keen depo. at 29, 50). Douglas Holt testified that this work was performed. (Holt depo. at 87-89). Holt and other witnesses also testified that there were no visible paint chips remaining anywhere on the property when Keen Cross finished its work. (Holt depo. at 87). Conversely, Ritchie testified in her deposition that there were hundreds of paint chips visible in the yard after the project was completed. (Ritchie depo. at 57). Even if this testimony is true, which we must assume in the context of summary judgment, Ritchie also swore under oath that Nolan did not eat any of the paint chips. (Id. at 63). Ritchie knows this because she never allowed Nolan to play in the yard without directly supervising the child. (Id. at 99, 144, 164). Thus, even if Nolan could argue for the first time on appeal that Turner acted recklessly in failing to ensure removal of paint chips from the lawn, Ritchie's own testimony establishes that the paint chips did not cause Nolan's illness. Turner raised causation as an issue below, and he would be entitled to summary judgment on that alternative basis even if the paint-chip issue were properly before us.
 {¶ 17} Nolan also argues that Turner acted recklessly by failing "to determine whether the door casings had been replaced in accordance with the contract specifications" when performing his final inspection. This argument concerns a *Page 9 
specification that called for two exterior door casings or frames to be replaced. The specifications provided for other items to be painted over with a long-lasting, heavy encapsulant paint. Turner testified that he conducted a visual inspection of the house after all work had been completed and observed no peeling or flaking paint. With regard to replacement of the door casings, he stated that it was impossible to tell whether the casings had been replaced or whether they simply had been painted with encapsulant paint. (Turner depo. at 81, 86, 89). Turner testified that there might have been an oral change-order providing for encapsulating rather than replacing the casings. (Id. at 83, 86-87, 122).
 {¶ 18} Other witnesses recognized, however, that it is possible to determine whether a lead-painted door casing has been replaced or painted over with encapsulant. CityWide employee Jaslyn Simon stated that Turner could have used his x-ray fluorescence ("XRF") gun to shoot gamma rays into the casings to determine whether lead paint still was present. A positive reading would indicate that the old lead paint had been covered and that the casings had not been replaced. On the other hand, a negative reading would indicate that new casings had been installed. (Simon depo. at 44-45). Nolan's expert witness, Richard Baker, agreed that an XRF gun could be used to make this determination. (Baker depo. at 61). Baker added, however, that it was "not standard industry practice" to use the XRF machine in this way. (Id.).
 {¶ 19} Although it may have been possible to use the XRF gun to determine whether the door casings had been replaced, we cannot say Turner acted recklessly by failing to employ a tactic that Nolan's own expert said was contrary to industry custom. The other option, a visual examination, gave Turner no reason to believe that the casings had not been replaced. In fact, the homeowner, Douglas Holt, testified that the door *Page 10 
casings at issue were replaced by the contractor. (Holt depo. at 37). In any event, we note that use of encapsulant paint to cover lead-based paint is a proper method of abatement. In his deposition, Baker identified the four acceptable approaches to abatement of lead paint as "enclosure, encapsulation, removal, and replacement." (Baker depo. at 76). Likewise, Turner explained that "[l]ead abatement is any action that under normal circumstances lasts 20 years. That could be paint removal, which obviously lasts longer than 20 years. Or covering physically with a barrier or with an encapsulant, which is designed to last 20 years under normal circumstances." (Turner depo. at 64).
 {¶ 20} Given that encapsulation is a proper abatement technique, Turner did not act recklessly during his final inspection even if he could have ascertained whether the door casings had been replaced. Simply put, there is no evidence that Turner had any reason to know or believe that the use of one recognized abatement technique, encapsulation, instead of another recognized abatement technique, replacement, would create an unreasonable risk of physical harm to anyone. Thus, while the specifications called for replacement of the door casings, Turner did not act recklessly in granting final approval of the project without knowing whether the casings had been replaced or encapsulated, even assuming arguendo that he should have been able to make this determination.
 {¶ 21} In her reply brief, Nolan also points out Turner's admission that a person cannot tell whether encapsulant is present once it has been painted over with regular paint. (Turner depo. at 77-78). Nolan apparently cites this testimony to suggest that the door casings were not covered with encapsulant. Turner did admit his inability to tell whether lead-based paint has been covered with an encapsulant once a top coat of fresh paint has been applied. Therefore, when conducting his final inspection, he simply *Page 11 
checked for freshly painted surfaces and the absence of flaking or peeling. To some extent, he had to rely on the word of the contractor. (Id. at 78-79). After Nolan became ill, however, Turner returned to 26 Simms Street and examined the door casings. (Id. at 132). During that examination, he observed what looked like encapsulant paint present on the door casings where the paint had been scrapped away. (Id. at 132-133, 153; see also Ritchie depo. at 95). Nolan cites no contrary evidence to support a finding that the door casings were neither replaced nor encapsulated. Nor has Nolan identified anything Turner could have done differently at the time of his inspection, other than reviewing the work and relying on contractors, to determine whether encapsulant paint was used to cover lead-based paint.
 {¶ 22} We are equally unpersuaded by Nolan's argument that Turner's recklessness is evident from his "utterly implausible" claim that he received lab test results back from Cincinnati within fourteen minutes of sending samples. This argument concerns dust samples collected by Turner during his December 19, 1997 final inspection of 26 Simms Street. He testified that he sent the samples to a lab in Cincinnati and received the results back the same day. Contrary to Nolan's argument, Turner did not claim that he received the results from Cincinnati fourteen minutes after sending the samples. To the best of his recollection, Turner testified that he sent the samples to Cincinnati in the morning and received faxed results back at 4:34 p.m. (Turner depo. at 95). Although Turner exhibited some uncertainty regarding the timing of the turnaround, we note that he was being asked about an incident that had occurred ten years earlier. In any event, we see nothing in this portion of his testimony that is indicative of recklessness. The lab result sheet from Cincinnati confirms that the samples were sent, analyzed, and found to be within acceptable limits. *Page 12 
 {¶ 23} Finally, we reject Nolan's argument that recklessness may be found in Turner's failure to prepare a clearance report after his final inspection of the property. This argument actually concerns Turner's preparation of a document called a "clearance certificate." (Turner depo. at 137). He explained that granting final clearance involves him sending in sample results with a clearance certificate that he fills out. (Id. at 89). The certificate includes his name, his license number, the date, and a statement that no lead hazards have been found. (Id. at 90). All witnesses with knowledge agreed that there was a final inspection with final clearance granted by Turner, which was necessary for the contractor to be paid. The record reflects only that the clearance certificate could not be located a decade later at the time of the lawsuit. (Id. at 89). Nolan fails to explain how loss of the clearance certificate is indicative of recklessness on the part of Turner or how it created an unreasonable risk of physical harm.
 {¶ 24} As set forth above, "[a]n individual acts `recklessly' when he `does an act or intentionally fails to do an act which is in his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.'" Hunter, 139 Ohio App.3d at 969. Even when viewed in the aggregate, Nolan has identified no acts or omissions committed by Turner that created an unreasonable risk of physical harm to anyone, and certainly not a risk substantially greater than is necessary to support a negligence claim. Therefore, the trial court did not err in finding that Nolan had failed to overcome the presumption of immunity that Turner enjoyed. See Tracy v. Tinnerman, Miami App. No. 2003-CA-21,2003-Ohio-6675, ¶ 9 (recognizing that "R.C. 2744.03(A)(6) creates a presumption of immunity for employees of a political *Page 13 
subdivision").
 {¶ 25} Nolan next contends the trial court erred in implicitly concluding that no reasonable juror could find in her favor on the issue of recklessness. She asserts that a trier of fact could find against Turner based on the alleged acts of misfeasance discussed above and his knowledge that great harm could result. In support, Nolan cites our statement in Whitfield v. Dayton, 167 Ohio App.3d 172, 182-183,2006-Ohio-2917, that "whether particular acts demonstrate the presence of wantonness, recklessness, or merely negligence is normally a decision for the jury, based on the totality of the circumstances."
 {¶ 26} Upon review, we find Nolan's argument to be unpersuasive. By entering summary judgment in favor of Turner on the basis of statutory immunity, the trial court necessarily did conclude that no reasonable trier of fact could find in her favor on the issue of recklessness. We see no error, however, in this conclusion. As set forth above, the acts and omissions about which Nolan complains did not constitute recklessness by Turner.
 {¶ 27} Although the line between recklessness and negligence often is a fine one, Nolan has done little to establish even actionable negligence by Turner. In our analysis above, we concluded that it was not necessary for the work specifications to include soil abatement or for post-abatement soil analysis to be done. We also found no support for Nolan's claim that Turner provided "utterly implausible" testimony about receiving test results from Cincinnati fourteen minutes after sending his samples. We then rejected the proposition that someone's loss of the clearance certificate was indicative of wrongdoing by Turner. The only other area in which Turner arguably might have been negligent involved his failure to determine whether the door casings were replaced as required by *Page 14 
the specifications. Even here, a finding of negligence would require evidence that Turner failed to take some action that he should have taken. Based on the evidence before us, the only way Turner could have determined whether the casings had been replaced required using his XRF gun in a way that Nolan's own expert witness admitted was "not standard industry practice." Moreover, because encapsulating lead paint is an equally acceptable method of abatement, Turner's failure to determine whether the casings had been replaced instead of encapsulated did not create an unreasonable risk of physical harm. Therefore, it is unlikely that Nolan could establish actionable negligence in this case. In any event, while the line between negligence and recklessness is often fine, we previously have found an employee entitled to summary judgment on the basis of immunity under R.C. Chapter 2744 when his "conduct constituted at most negligence." See, e.g., Weber v. Haley (May 1, 1998), Clark App. No. 97CA108. We find that to be the case here. Construing the evidence in a light most favorable to Nolan, we find no genuine issue of material fact as to whether Turner acted recklessly.
 {¶ 28} In a final argument, Nolan asserts that the trial court erred in applying an incorrect standard to determine what constitutes reckless behavior. In particular, Nolan takes issue with the following statement by the trial court: "The evidence does not indicate that Mr. Turner did not care if he made mistakes, that he did anything intentionally, that he had an ulterior motive, or that he did anything other than perhaps make mistakes." Nolan contends this is not the proper test for recklessness. In its decision, however, the trial court continued: "The evidence offered by Plaintiff may present a genuine issue of material fact as to whether Mr. Turner was negligent, but it does not create an issue as to whether he engaged in `willful or wanton misconduct.' The record is devoid of evidence that Mr. Turner acted recklessly. The Plaintiff has not rebutted or created a genuine issue *Page 15 
of material fact concerning the immunity presumption." (Doc. #214 at 11).
 {¶ 29} A review of the trial court's decision as a whole reveals that it was aware of the test for recklessness. At one point, the trial court quoted a definition set forth in Webb v. Edward, 165 Ohio App.3d 158,2005-Ohio-6379, ¶ 28, as follows: "`Wanton and reckless conduct' is defined as perversely disregarding a known risk, or acting or intentionally failing to act in contravention of a duty, knowing or having reason to know of facts which would lead a reasonable person to realize such conduct creates an unreasonable risk of harm substantially greater than the risk necessary to make the conduct negligent." (Doc. #214 at 6-7). This is essentially the same definition found inHunter, 139 Ohio App.3d at 969, a case cited favorably by Nolan and quoted in our analysis above. In any event, assuming arguendo that the trial court had some misconception about the definition of recklessness, our de novo review has cured any error.
 {¶ 30} Based on the reasoning set forth above, we overrule Nolan's assignment of error and affirm the judgment of the Montgomery County Common Pleas Court.
FAIN, J., and GRADY, J., concur.
Copies mailed to:
Jeffrey R. McQuiston
David G. Roach
Konrad Kircher
Michael F. Arnold
 Hon. Jeffrey E. Froelich *Page 1