[Cite as *Argabrite v. Neer*, 2015-Ohio-125.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY   COUNTY

| | | |
|---|---|---|
| PAMELA ARGABRITE | : | |
| | : | Appellate Case No. 26220 |
| Plaintiff-Appellant | : | |
| | : | Trial Court Case No. 12-CV-7402 |
| v. | : | |
| | : | |
| JIM NEER, et al. | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| Defendants-Appellees | : | |
| | : | |

. . . . . . . . . . .

## O P I N I O N

Rendered on the 16th day of January, 2015.

. . . . . . . . . . .

KENNETH J. IGNOZZI, Atty. Reg. #0055431, Dyer, Garofalo, Mann, & Schultz, 131 North Ludlow Street, Suite 1400, Dayton, Ohio 45402
      Attorney for Plaintiff-Appellant, Pamela Argabrite

LISA A. LUEBKE, Atty. Reg. #0081315, and JOHN CUMMING, Atty. Reg. #0018710, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Defendants-Appellees, Tony Ball, Daniel Adkins, Julie Stephens and Karen Osterfield

LAWRENCE E. BARBIERE, Atty. Reg. #0027106, Schroeder, Maundrell, Barbiere & Powers, 5300 Socialville Foster Road, Suite 200, Mason, Ohio 45040
      Attorney for Defendant-Appellee, John Dipietro

EDWARD J. DOWD, Atty. Reg. #0018681, and JOSHUA SCHIERLOH, Atty. Reg. #0078325, 1 Prestige Place, Suite 700, Miamisburg, Ohio 45342
      Attorneys for Defendants-Appellees, Jim Neer and Gregory Stites

. . . . . . . . . . . .

HALL, J.

{¶ 1}    Around noon on July 11, 2011, Miami Township police officers Jim Neer and Gregory Stites pursued fleeing burglary suspect Andrew Barnhart along streets in Miami Township and Washington Township while Deputy Chief John DiPietro supervised from the police department. Deputy Tony Ball and Sergeant Daniel Adkins of the Montgomery County Sheriff's Office were also providing assistance. The pursuit ended when the suspect pulled into the opposing traffic lane and crashed head-on into the oncoming vehicle driven by Pamela Argabrite. The suspect was killed, and Argabrite was seriously injured. Argabrite filed a negligence action against the five officers involved in the pursuit to recover damages for her injuries.

{¶ 2}    The defendants all moved for summary judgment, contending that they are immune from liability under R.C. 2744.03(A)(6)(b) of the Political Subdivision Tort Liability Act, which "provides immunity to employees of a political subdivision for acts that are not committed in a wanton or reckless manner," *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, ¶ 39. The defendants also contended that they were not the proximate cause of Argabrite's injuries under the rule applied by this Court in *Whitfield v. Dayton*, 167 Ohio App.3d 172, 2006-Ohio-2917, 854 N.E.2d 532 (2d Dist.)[1], which requires extreme or outrageous conduct by police officers before proximate cause is established in a pursuit where the injuries result from a crash by the pursued vehicle. The county officers also argued that they were not pursuing the suspect. Argabrite argued that the pursuit was wanton and reckless because the officers engaged in a high-speed chase through commercial and residential areas during heavy traffic when the suspect was not violent and could have been later

---

[1] We note that *Whitfield* was effectively overruled, in part, on other grounds by *Anderson v. Massillon*, 134 Ohio St.3d 380, at ¶ 29-31.

apprehended with a warrant.

{¶ 3}   The trial court granted the summary judgment motions on the proximate-cause issue. As to the county officers, the court concluded that no reasonable juror could find that the conduct of either officer was extreme or outrageous. Officer Adkins, said the court, was not involved in the pursuit, and Officer Ball's tracking of the suspect was at a distance and at reasonable speeds, breaking off well before the accident in favor of the Miami Township officers. As to the township officers, the trial court concluded that their conduct was reckless, but no reasonable juror could conclude that their conduct was extreme or outrageous.

{¶ 4}   Argabrite appealed, alleging in the sole assignment of error that the trial court erred by granting summary judgment. Our review of a summary judgment decision is de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). This means we use the same standard that the trial court should have used, and we determine whether the evidence presents a genuine issue of fact for trial. *Dupler v. Mansfield Journal Co.*, 64 Ohio St.2d 116, 413 N.E.2d 1187 (1980). The trial court's decision is not granted any deference by the reviewing appellate court. *Brown v. Scioto Cty. Bd. Of Commrs.*, 87 Ohio App.3d 704, 711, 622 N.E.2d 1153 (4th Dist.1993). Therefore, we could review and analyze whether the trial court's conclusion that Township officers Neer and Stites were reckless is supported by the record or, if a genuine issue of recklessness is found, whether that behavior was the proximate cause of Barnhart's collision with the Argabrite vehicle. If there is no genuine issue of either recklessness or proximate cause resulting from recklessness, then the officers are entitled to immunity under R.C. 2744.03(A)(6). But we need not, and do not, engage in that analysis at this juncture because of our determination that the no-proximate-cause rule of *Whitfield v. Dayton,* requiring extreme

or outrageous conduct, is dispositive of this appeal.

{¶ 5}  Argabrite asks us to reconsider the proximate-cause rule applied in *Whitfield*. This rule comes from the Ninth District's "no proximate cause" holding in *Lewis v. Bland*: "When a law enforcement officer pursues a fleeing violator and the violator injures a third party as a result of the chase, the officer's pursuit is not the proximate cause of those injuries unless the circumstances indicate extreme or outrageous conduct by the officer, as the possibility that the violator will injure a third party is too remote to create liability until the officer's conduct becomes extreme." 75 Ohio App.3d 453, 456, 599 N.E.2d 814 (9th Dist.1991). We adhered to this holding in *Whitfield* because we recognized it as "established law" in Ohio. *Whitfield*, 167 Ohio App.3d 172, 2006-Ohio-2917, 854 N.E.2d 532, at ¶ 59. "Ohio appellate districts, including our own," we said, "* * * apply the 'no proximate cause' holding of *Lewis* to cases where pursuits end in injury to innocent third parties or to occupants of the pursued vehicle without direct contact with a police vehicle." *Id*. at ¶ 57, citing *Jackson v. Poland Twp.*, 7th Dist. Mahoning Nos. 96 CA 261, 97 CA 13, and 98 CA 105, 1999 WL 783959 (Sept. 29, 1999); *Pylypiv v. Parma*, 8th Dist. Cuyahoga No. 85995, 2005-Ohio-6364; *Shalkhauser v. Medina*, 148 Ohio App.3d 41, 2002-Ohio-222, 772 N.E.2d 129 (9th Dist.); *Heard v. Toledo*, 6th Dist. Lucas No. L-03-1032, 2003-Ohio-5191, ¶ 12 (rejecting an argument that *Lewis* is "outdated, contrary to sound public policy and should no longer govern Ohio cases"); and *Sutterlin v. Barnard*, 2d Dist. Montgomery No. 13201, 1992 WL 274641 (Oct. 6, 1992) (a previous case in which this district followed *Lewis*'s approach).

{¶ 6}  According to Argabrite, the "no proximate cause" rule is the minority position in this country: "The majority of jurisdictions, focusing on the importance of public safety, adopt

the longstanding, general rules of proximate causation in which a police officer may be liable for damages where his actions are a substantial factor in bringing about the end result, or at least when their conduct is reckless. Courts that reject the 'no proximate cause rule' have urged that using the majority standard increases public safety and is generally more consistent with the policies of police agencies." (Brief of Plaintiff-Appellant, Pamela Argabrite, 25). Argabrite also cites the dissenting judge in *Whitfield*, Judge Brogan, who disagreed with the "no proximate cause" rule. He agreed with the dissenting judge in *Lewis* that the rule fails to recognize that " 'multiple actors can combine to provide causation in a given instance.' " *Whitfield* at ¶ 118 (Brogan, J., dissenting), quoting *Lewis* at 459 (Cacioppo, J., dissenting). Judge Brogan agreed with the majority view, that if a plaintiff alleges police negligence in a pursuit, the issue of proximate cause should be considered simply a question of fact. Rather, we should say that Judge Brogan *agrees* with the majority view. He is the trial judge in this case, and in his summary-judgment decision he urges us to reverse *Whitfield* on this point.

{¶ 7} The "no proximate cause" rule is still the established law in this state. Since *Whitfield*, no Ohio court has questioned the rule, and at least one has rejected an argument not to follow it, *see Perry v. Liberty Twp.*, 11th Dist. Trumbull No. 2012-T-0056, 2013-Ohio-741, ¶ 18-21. We are not convinced that this is the case in which to reconsider the rule.

{¶ 8} The remaining issue is whether the trial court applied the "no proximate cause" rule correctly in this case. To determine whether the police officers' conduct was extreme or outrageous in *Whitfield* we referred to the description of extreme and outrageous conduct adopted by the Ohio Supreme Court: The conduct is " 'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" ' " *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen, & Helpers of America*, 6 Ohio St.3d 369, 375, 453 N.E.2d 666 (1983), quoting 1 Restatement of the Law 2d, Torts, Section 46, Comment d (1965). "Obviously, this is an exceptionally difficult standard to meet." *Whitfield*, 167 Ohio App.3d 172, 2006-Ohio-2917, 854 N.E.2d 532, at ¶ 61.

**{¶ 9}** "In a case decided on summary judgment, we must determine whether an issue of material fact remains to be litigated, whether the moving party is entitled to judgment as a matter of law, and whether when viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can only reach a conclusion that is adverse to the nonmoving party." *Snyder v. Ohio Dept. of Natural Resources*, Slip Opinion No. 2014-Ohio-3942, ¶ 20, citing Civ.R. 56(C), and *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977). The evidence here is primarily the depositions of the defendant police officers plus the depositions and affidavits of two experts retained by Argabrite. About the relevant facts the evidence shows no genuine dispute. The question here is whether a reasonable mind, viewing the evidence most strongly in Argabrite's favor, could find that the conduct of any of the officers was extreme and outrageous, that is, "atrocious, and utterly intolerable in a civilized society."

**{¶ 10}** At 11:37 a.m. on July 11, 2011, Sergeant Rex Thompson was sitting in his office at the Miami Township Police Department when he heard on his police radio dispatch that there was a burglary in progress in Washington Township. The suspects were identified as two black males who had just broken into a residence, taken some items, and were leaving in a white vehicle without a front license plate. About 15 minutes later, the suspects' vehicle was further

described as a white, older model "box style" Chevy Caprice, missing its hubcaps. The suspects were said to be wearing white t-shirts and fleeing in the direction of Interstate 675.

{¶ 11}   Sergeant Thompson was the shift supervisor of the Miami Township police road patrol division that day and was in charge of all the Miami Township police officers and responsible for any police pursuits. Thompson left his office and got into his cruiser so that he could monitor the roadways nearby in the event the suspects' vehicle drove past. While Thompson monitored the roadway, he heard on the radio one of his patrol officers tell officer Gregory Stites that the description of the car involved in the burglary sounded like a car last seen at a residence on Mardell Drive. Thompson radioed Stites that he would meet him on Mardell Drive to investigate.

{¶ 12}   Thompson arrived first. Parked in the driveway at 2037 Mardell Drive, he saw an older, white Chevy Caprice with no hubcaps. The driver's side door was open and someone was sitting in the driver's seat with a leg draped out the door. Thompson pulled into the driveway and parked his cruiser 6 to 8 feet behind the car. Meanwhile, Stites had arrived and pulled up to the curb.

{¶ 13}   Thompson got out and slowly approached the car, hoping to catch its occupant off-guard. Thompson was within 10 feet of the open driver's side door when the person sitting in the driver's seat exited the car, talking on a cell phone. He startled when he saw Thompson and immediately turned around and got back into the car. Thompson, concerned that the man might be attempting to get a weapon, drew his gun and started shouting at the man to stop. But he didn't stop. Instead, he slammed the car door closed and started the engine. Thompson moved to within touching distance of the driver's side and continued to shout to the suspect through the open

driver's side window, "Police, stop, don't do it." (Thompson dep. 21). The suspect didn't listen. He revved the engine, dropped the car into reverse, and tires spinning, slammed into Thompson's cruiser. The suspect then threw the car into drive and smashed into the brick garage in front of him. Again the suspect dropped into reverse and slammed into the cruiser. Suddenly, the passenger-side door opened and a man, who Thompson had not seen, leapt out and started to run. At the same time, the suspect threw the car into drive and cranked the steering wheel to the right. Its tires spinning, the car tore off a corner section of the brick garage and escaped down the side yard. The car drove through several back yards before making it back to Mardell Drive.

{¶ 14} Thompson called in the license plate of the fleeing car. Then, since there were other officers around, he turned his attention to the fleeing passenger. Thompson found the man laying in the ravine behind the house, where the man had broken his leg. After calling for medical assistance, Thompson stayed with the man and asked him the name of the driver, but the man refused to say.

{¶ 15} Miami Township police officer Jim Neer was on patrol a few blocks away from Mardell Drive when he heard the radio broadcast about the burglary and the white car on Mardell Drive. He headed that way, arriving on the street just in time to see the car going through the side yard. Neer turned on his lights and sirens and told dispatch that he was in pursuit. Officer Stites, parked in front of the Mardell Drive house, joined Neer in the pursuit.

{¶ 16} John DiPietro was the Deputy Chief of Police for Miami Township. When the radio broadcast about the burglary went out, he was at the police service garage. Initially, DiPietro only heard a small portion of the information relayed over the radio as he was talking with people at the garage, and the radio did not have his full attention. DiPietro did hear a

transmission from Thompson stating that he was on patrol looking for the suspects' vehicle. Then DiPietro thought he heard Thompson say that he had been hit. Shortly thereafter, when DiPietro heard Thompson say that he was out of service, he started paying attention. DiPietro was not entirely sure what had just occurred, but based on what he had heard, he assumed that some sort of violent encounter had taken place between Thompson and the suspect. After it became apparent to DiPietro that several officers were now pursuing the suspect, and that Thompson was out of service, DiPietro realized that it was his duty, as the next highest ranking officer listening to the radio, to assume control of the pursuit, which he did at 11:54 a.m. By then, DiPietro had left the service garage and was heading back to the police department. He began monitoring the pursuing officers' actions and asked them to keep calling out their locations and any other information. DiPietro's intention was to have other officers get ahead of the pursuit and deploy Stop Sticks to halt the suspect's vehicle. He also asked dispatch to issue an alert to surrounding agencies.

{¶ 17}  From Mardell Drive the suspect's car headed south on Graceland Street and then east on State Route 725. At the Lyons Road intersection the light was red, and the suspect slowed as he approached the intersection before going into the opposing lane, through the red light, and north on Lyons Road. Neer, then Stites, cautiously followed through the intersection. By the time Neer was on Lyons Road, the suspect was more than 100 yards ahead of him. At McEwen Road, the suspect slowed and turned south. As the suspect approached S.R. 725, he slowed and waited for traffic to clear before continuing. Neer and Stites also slowed before proceeding through the intersection, "inch[ing] [their] way through it as well." (Stites dep. 39). Captain Karen Osterfeld of the Montgomery County Sheriff's Office assisted by blocking westbound traffic from entering

the S.R. 725-McEwen Road intersection.

{¶ 18} Further south of S.R. 725, on McEwen Road, is the Montgomery County Sheriff's Office Washington Township substation. Deputy Tony Ball was there when he heard over his radio that Miami Township officers were headed into Washington Township. Ball got into his cruiser and headed north on McEwen Road. Before he got to S.R. 725, a white car that matched the description of the vehicle being driven by the suspect passed him in the opposite lane, traveling "faster than normal" and going into opposing lanes of travel. (Ball dep. 14-15). Ball could not see any police vehicles in pursuit, though he saw their lights in the distance and figured that they had gotten "held up" at an intersection. (*Id*. at 17). He decided to follow the suspect to at least keep eyes on it until the Miami Township officers caught up. Ball turned on his lights and siren, made a u-turn, and immediately turned off the lights and siren. At Spring Valley Pike intersection, Ball again turned on his lights and siren briefly and followed the suspect west. Ball looked back to see whether the Miami Township officers were close enough so that he could "get out of their way," (*Id*. at 22), as he was only trying to keep the suspect in sight and did not intend to pursue. They hadn't caught up yet. As he followed the suspect, Ball activated either his lights or his lights and siren when he was passing vehicles or going through intersections in order to warn motorists that he and the Miami Township officers were coming through the area. Finally, Ball saw that the Miami Township police officers had caught up, so he began looking for a place to pull over to allow them to pass. Fearing that if he pulled over or tried to maneuver out of their way, they would follow him, Ball radioed the officers to pass him when he was just east of Washington Church Road. When he pulled into the middle lane and slowed, Neer and Stites passed him. Ball continued west on Spring Valley Pike without his lights or siren, though he

occasionally turned on his lights to pass a vehicle.

{¶ 19}   After Neer and Stites passed Ball, they accelerated because the suspect was now well ahead of them. They slowed as they crested a hill to see if the suspect had gone down a side street, but Neer saw the white car ahead of them, at the S.R. 741 intersection. The suspect slowed, or stopped, and waited for traffic to clear the intersection before going through a red light and turning south.

{¶ 20}   Sergeant Daniel Adkins of the Montgomery County Sheriff's Office heard the radio broadcast about the burglary while he was on patrol in Washington Township. While driving to the scene of the burglary, Adkins heard that the suspects had left the area in an older white car, so Adkins started driving around the general area, hoping to find it. When he heard over the radio that Miami Township officers were in pursuit, Adkins began to follow the pursuit from the north, thinking that they might need him to assist in clearing intersections or to wait for the suspect to flee on foot. He worked his way over to S.R. 741, reasoning that if the suspect went north on that road, he (Adkins) would need to help direct traffic because at that time of the day traffic would be "horrendous." (Adkins dep. 12). But the suspect went south, and Adkins never saw him.

{¶ 21}   When Neer reached the Spring Valley Pike and S.R. 741 intersection, he slowed, then stopped, and made sure no traffic was coming in either direction before proceeding. Once on S.R. 741, Neer accelerated in order to catch up to the suspect, who was well ahead of him and cresting a hill near Waldruhe Park. Neer and Stites lost sight of the suspect until they crested the same hill. When they caught sight of him again, they watched him move left into the opposing lane of traffic and crash head-on into Argabrite. The crash was announced over the radio at 11:57

a.m. When Ball heard the announcement, he was stopped at a red light at the S.R. 741 intersection. When the light turned green, he turned on his lights and siren and responded to the crash to assist.

{¶ 22} Argabrite contends that the pursuit was extreme or outrageous because the officers pursued at high speeds through residential areas, because the police officers violated their respective policies on motor vehicle pursuits, and because they knew who the suspect was and could have arrested him with a warrant.

{¶ 23} In all, the pursuit covered just under 6 miles and lasted just under 7 minutes. The speed limits along the route ranged from 25 m.p.h. on Graceland Street to 45 m.p.h. on S.R. 725 to 35 m.p.h. on Spring Valley Road to 55 m.p.h. on S.R. 741. Ball estimated that while on McEwen Road he drove 45-50 m.p.h. Stites testified that on Spring Valley Road, before he reached Washington Church Road, he was traveling at 45-50 m.p.h. Neer testified that, after he passed Ball, he accelerated to between 60 and 80 m.p.h. because the suspect was now well ahead of him. Stites said that on S.R. 741 he never went over 70 m.p.h. The weather during the pursuit was clear, dry, and sunny. Neer and Stites both testified that the traffic during the pursuit was generally light. Stites said that he was able to negotiate it without any problems. Under the described circumstances, no reasonable juror could conclude that the officers' speeds during the pursuit were extreme or outrageous.

{¶ 24} The Miami Township Pursuit of Motor Vehicles Policy allows an officer to pursue a fleeing suspect who the officer has probable cause to believe committed a burglary or felonious assault. (Miami Township Pursuit of Motor Vehicles Policy, 41.2.8(C)). But the policy also states that "[i]f the risk to the public from the initiation or continuation, of a pursuit

outweighs the risk from not initiating the pursuit or discontinuation, the pursuit shall be terminated." (*Id*.). An officer "must terminate a pursuit" when "[t]he risks to personal safety and/or the safety of others outweigh the dangers presented if the suspect is not apprehended" or when "[t]he identity of the offender is known and risk of escape poses less threat than risk from attempt to capture." (*Id*. at 41.2.8(C)(7)(b)(1) and (2)). An officer must also terminate a pursuit "when the probability of harm to the officer or general public is increased by the actions of the suspect vehicle," which occurs when "[t]he suspect vehicle travels into oncoming traffic" or when "[s]peeds increase to a level unsafe for conditions." (*Id*. at 41.2.8(C)(8)(a)(1) and (4)). According to the Montgomery County Sheriff's Office pursuit policy, the only offense for which a deputy may pursue a suspect is a "felony involving the infliction or threatened infliction of serious physical harm." (General Orders Manual, 5.1.4(A)(2) (5th Ed.)).

**{¶ 25}** Even if it is assumed for the sake of analysis that the officers did violate their respective pursuit policies, their conduct was not extreme or outrageous. The most that can be said of a violation of a "departmental policy enacted for the safety of the public" is that it "may be relevant to determining the culpability of a course of conduct." *Anderson*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, at ¶ 37; *see also Shalkhauser*, 148 Ohio App.3d at 51, 772 N.E.2d 129 (saying, "a violation of an internal departmental procedure is irrelevant to the issue of whether appellees' conduct constituted willful or wanton misconduct"). " 'Without evidence of an accompanying knowledge that the violations "will in all probability result in injury," *Fabrey [v. McDonald Village Police Dept.]*, 70 Ohio St.3d [351] at 356, 639 N.E.2d 31 [ (1994) ] evidence that policies have been violated demonstrates negligence at best.' " *Anderson* at ¶ 38, quoting *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, 889 N.E.2d 505, ¶ 92. Here,

even if there is a factual question as to whether either Neer or Stites violated their pursuit policy, there is no evidence to conclude that either knew that the violation would probably cause someone injury. Neer testified that he knew that under the pursuit policy he could pursue a fleeing suspect who had committed a burglary or felonious assault. DiPietro testified that he did not believe that any of the information that he received from his officers during the pursuit warranted terminating the pursuit. Although DiPietro never asked for the speeds of the vehicles, we note that, in all, he was in control of the pursuit for only about 3 minutes. With regard to Ball and Adkins not only is there is no evidence that either of them knew of any violation of their pursuit policy, but if there was a violation, there is no evidence that either knew that the violation would probably cause someone injury and, regardless of the standard applied, their actions were not the proximate cause of the eventual crash. Each of Argabrite's experts states in his affidavit that the defendants intentionally disregarded their respective pursuit policies. (*See* McDevitt Aff. ¶ 5; Ashton Aff. ¶ 6). This evidence, though, "does not create any issues of *fact*, but merely states appellant's position with respect to appellees' culpability, which is a legal conclusion." (Citation omitted.) (Emphasis sic.) *Shalkhauser* at 51.

{¶ 26} Neer and DiPietro each testified that he did not know who the suspect was until after the crash. But Stites knew early on. Three months earlier, the same white car had failed to stop for another officer, and Stites and that officer discovered that the car was registered to Andrew Barnhart's mother. One could speculate whether the officers should have discontinued the pursuit, and at what point that decision should be made. But that's not the right question here. The question is, was the pursuit extreme or outrageous? We do not think that a reasonable person could fairly say that it was.

**{¶ 27}** None of the officers' conduct may fairly be characterized as "atrocious, and utterly intolerable in a civilized society." Certainly, nothing about Ball's or Adkins' conduct comes close. While one of Argabrite's experts states in his affidavit that Neer's, Stites's, DiPietro's, and Ball's conduct was outrageous and unconscionable, (*see* McDevitt Aff. ¶ 5), such evidence, as we said above, states a legal conclusion, not a factual assertion. The trial court disagreed and so do we.

**{¶ 28}** Lastly, we need not address whether the officers are immune under the Political Subdivision Tort Liability Act. As we said in *Whitfield*, "since there must always be a causal connection between disputed conduct and an injury, a plaintiff would have to satisfy proximate-cause requirements even if an officer's conduct is wanton or reckless." *Whitfield*, 167 Ohio App.3d 172, 2006-Ohio-2917, 854 N.E.2d 532, at ¶ 44. That issue is dispositive.

**{¶ 29}** The sole assignment of error is overruled.

**{¶ 30}** The trial court's judgment is affirmed.

. . . . . . . . . . . . .

WELBAUM, J., concurs.

FROELICH, P.J., dissenting.

**{¶ 31}** I dissent from the majority's conclusion that *Whitfield v. Dayton*, 167 Ohio App.3d 172, 2006-Ohio-2917, 854 N.E.2d 532 (2d Dist.), should continue to be followed.

**{¶ 32}** A claim for personal injuries requires the existence of a duty, the defendant's breach of that duty, and injury or damages that are proximately caused by that breach. *Wallace v. Ohio Dept. of Commerce*, 96 Ohio St.3d 266, 2002-Ohio-4210, 773 N.E.2d 1018, ¶ 22. Without proximate cause, there can be no liability.

{¶ 33}  Proximate cause is the law's distinction between the injury's cause in fact and causation for which society holds an actor responsible.[2]  The Supreme Court of Ohio has discussed proximate cause, stating:

> The term, "proximate cause," is often difficult of exact definition as applied to the facts of a particular case.  However, it is generally true that, where an original act is wrongful or negligent and in a natural and continuous sequence produces a result which would not have taken place without the act, proximate cause is established, and the fact that some other act unites with the original act to cause injury does not relieve the initial offender from liability.

*Clinger v. Duncan*, 166 Ohio St. 216, 222, 141 N.E.2d 156 (1957).  An injury is the natural and probable consequence of an act if the injury complained of "could have been foreseen or reasonably anticipated" from the conduct.  *Strother v. Hutchinson*, 67 Ohio St.2d 282, 287, 423 N.E.2d 467 (1981).

{¶ 34}  According to *Lewis v. Bland*, 75 Ohio App.3d 454, 599 N.E.2d 814 (9th Dist.1991), and the cases that follow it, police officers must engage in "extreme or outrageous conduct" before there can be proximate cause.  *Id*. at 456.  This approach is contrary to traditional notions of proximate cause, which focus on the foreseeability of the consequence, not

---

[2]  Everything causes everything.  As we stated in *Didier v. Johns*, 114 Ohio App.3d 746, 684 N.E.2d 337 (2d Dist.1996):

> In our universe, all events can be analyzed as caused by all other events.  It is a weary truism now, thanks to the explorations of chaos theory, that "but for" the flapping of a butterfly's wings in Mexico, Dorothy would never have been blown to Oz.
>
> On the scale of human (not just physical) events, historical interactions have been thoroughly revealed and explored.  In short, the "but for" analysis casts a net so wide that conceivably all events are traceable to all other events, and the touchstone of individual responsibility sinks beneath a sea billowing with enumerable occurrences all jostling each other.

(Footnotes omitted.)  *Id.* at 753 (Young, J.).

on the wrongfulness of the conduct that produces the result.

{¶ 35} Ohio's sovereign immunity statute sets forth standards imposing liability of governmental entities and their employees for wrongful conduct. R.C. 2744.03(A)(6) grants employees of political subdivisions immunity from liability, unless any of three exceptions to that immunity applies. *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, ¶ 21. Those exceptions are (1) the employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities; (2) the employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; and (3) civil liability is expressly imposed upon the employee by a section of the Revised Code. R.C. 2744.03(A)(6)(a)-(c). Thus, of relevance here, police officers involved in police chases have a duty not to proximately cause injury by acting maliciously, in bad faith, or in a wanton or reckless manner. R.C. 2744.03(A)(6)(b). They are immune from suit, unless their actions were performed "with malicious purpose, in bad faith, or in a wanton or reckless manner." *Id.*

{¶ 36} As we stated in *Moon v. Trotwood Madison City Schs.*, 2014-Ohio-1110, 9 N.E.2d 541 (2d Dist.):

> The terms "wanton" and "reckless" describe different and distinct degrees of care and are not interchangeable. *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, paragraph one of the syllabus. They are sometimes described "as being on a continuum, i.e., willful conduct is more culpable than wanton, and wanton conduct is more culpable than reckless." *Id.* at ¶ 42 (Lanzinger, J., concurring in judgment in part and dissenting in part).
>
> Recklessness is a high standard. *Rankin v. Cuyahoga Cty. Dept. of*

*Children and Family Servs*., 118 Ohio St.3d 392, 2008-Ohio-2567, 889 N.E.2d 521, ¶ 37. "Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson* at ¶ 34, adopting 2 Restatement of the Law 2d, Torts, Section 500 (1965).

*Moon* at ¶ 20-21.

{¶ 37}   By requiring extreme and outrageous conduct to establish proximate cause (which is required for liability), *Lewis* usurps the legislative determination as to the type of conduct that is required of employees of political subdivisions for immunity from liability. Under *Lewis*, even if a police officer is reckless, the officer would still be immune from liability unless the conduct is extreme or outrageous.   The argument that *Lewis* involves "proximate cause" as opposed to "duty" could devolve into a historical or pedagogical discussion of duty versus proximate cause.   *See, e.g., Palsgraf v. Long Island R.Co*., 248 N.Y. 339, 162 N.E. 99 (1928).   Suffice it to say, the bottom-line concerning potential responsibility is the same.   It may or may not be good public policy to require "extreme or outrageous" conduct to remove immunity and impose liability upon police officers who pursue a fleeing suspect, but that question has been decided by the legislature when it only required "reckless" conduct.

{¶ 38}   If the legislature desired a different standard for immunity when police officers are pursuing fleeing suspects in their vehicles, the legislature could have expressly created such an exception.   The legislature has created an exception to political subdivision liability for negligent operation of a motor vehicle when a police officer "was operating a motor vehicle

while responding to an emergency call and the operation of the vehicle did not constitute willful or wanton misconduct." R.C. 2744.02(B)(1)(a). No specific immunity provision exists for police officers regarding their pursuit of a fleeing suspect other than that found in R.C. 2744.03(A)(6)(b).

{¶ 39} I concede that stare decisis weighs in favor of following *Whitfield*, which followed *Lewis*. However, *Anderson* has since clarified certain definitions regarding the degrees of care for purposes of the sovereign immunity statute. Moreover, I believe that *Whitfield* was wrongly decided at the time, the decision defies practical workability, and abandoning the precedent would not cause undue hardship for those who have relied on it. *See Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 215, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 48 (adopting a standard to determine when courts may vary from established precedent).

. . . . . . . . . . . . .

Copies mailed to:

Kenneth J. Ignozzi
Liza J. Luebke
John Cumming
Lawrence E. Barbiere
Edward J. Dowd
Joshua R. Schierloh
Hon. James A. Brogan
(sitting for Judge Barbara P. Gorman)